# EXHIBIT

# 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **ACTON ACADEMY, A NONPROFIT CORPORATION,** *Plaintiff* | § | |
| **v.** | § | |
| **TIM KENNEDY, APOGEE DENTON, LLC, APOGEE TX HIGH PLAINS, LLC, DOUG MORELAND AND SUZANE MORELAND D/B/A APOGEE FORT DAVIS, APOGEE FARMERSVILLE 719 EDUCATION CENTER, LLC, CAMERON PENN AND LAUREN PENN D/B/A APOGEE NORTH TEXAS, APOGEE LOCKHART LIFE LEARNING CENTER, LLC, APOGEE STRONG SAN ANTONIO, LLC, APOGEE KELLER, LLC, FATTIG BUSINESS DEVELOPMENT SERVICES, LLC D/B/A APOGEE LEAGUE CITY EAST, APOGEE NEW JERSEY, LLC, APOGEE BY THE SEA NJ, LLC, APOGEE BUCKEYE LAKE, LLC, TEACHING TO THE HEART, LLC D/B/A APOGEE CINCINNATI, APOGEE GAHANNA, LLC, KINGSBRIDGE ACADEMY D/B/A APOGEE DAYTON, JASON HERRICK D/B/A APOGEE HOCO, APOGEE CHARLOTTE COUNTY, LLC, APOGEE STRONG ORLANDO, LLC, EDUCATIONAL FREEDOM, LLC, D/B/A APOGEE ODESSA, APOGEE 926, LLC, APOGEE STRONG ANSON, LLC, APOGEE TAHOE, LLC, APOGEE SAN DIEGO, LLC, APOGEE SUMMIT COLORADO, LLC, AND APOGEE STRONG COLORADO HOLDINGS D/B/A APOGEE STRONG DENVER** *Defendants* | § | CIVIL ACTION NO. 24-1456 |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff Acton Academy. ("Plaintiff" or "Acton"), files this Original Complaint and Jury Demand, complaining of Defendants Tim Kennedy ("Kennedy"), Apogee TX High Plains, LLC

("Apogee TX High Plains"), Apogee Denton, LLC ("Apogee Denton"), Cameron Penn and Lauren Penn d/b/a Apogee North Texas (collectively, "Apogee North Texas"), Apogee Farmersville 719 Education Center, LLC ("Apogee Farmersville"), Fattig Business Development Services, LLC d/b/a Apogee League City East ("Apogee League City East"), Apogee Lockhart Life Learning Center, LLC ("Apogee Life Learning Center"), Apogee Strong San Antonio, LLC ("Apogee Strong San Antonio"), Doug Moreland and Suzane Moreland d/b/a Apogee Fort Davis (collectively, "Apogee Fort Davis"), Apogee Keller, LLC ("Apogee Keller"), Jason Herrick d/b/a Apogee HOCO ("Apogee HOCO), Apogee New Jersey, LLC ("Apogee New Jersey"), Apogee by the Sea NJ, LLC ("Apogee by the Sea"), Apogee Buckeye Lake, LLC ("Apogee Buckeye") Kingsbridge Academy d/b/a Apogee Dayton ("Apogee Dayton"), Teaching to the Heart, LLC d/b/a Apogee Cincinnati ("Apogee Cincinnati"), Apogee Gahanna, LLC ("Apogee Gahanna"), Apogee 926, LLC ("Apogee 926"), Apogee Strong Anson, LLC ("Apogee Anson"), Apogee Charlotte County, LLC ("Apogee Charlotte"), Apogee Strong Orlando, LLC ("Apogee Strong Orlando), Educational Freedom, LLC d/b/a Apogee Odessa ("Apogee Odessa"), Apogee San Diego, LLC ("Apogee San Diego"), Apogee Tahoe, LLC ("Apogee Tahoe), Apogee Summit Colorado, LLC ("Apogee Summit Colorado"), Apogee Strong Colorado Holdings d/b/a Apogee Strong Denver ("Apogee Strong Denver), (collectively, "Defendants") and in support would respectfully show the following:

## I. VENUE AND JURISDICTION

1. Acton Academy's claims arise under the trademark laws of the United States, namely 15 U.S.C. § 1051 *et seq*., under the trademark laws of the State of Texas, namely Tex. Bus. & Com. Code § 16.001 *et seq.*, under the trade secret laws of the United States, namely 18 U.S.C. § 1836 *et seq.*, under the trade secret laws of the State of Texas, namely Tex. Civ. Prac. & Rem.

Code § 134A.001, *et seq.*, Chapter 37 of the Texas Civil Practice and Remedies Code, and under the Declaratory Judgment Act of the United States, 28 U.S.C. §§ 2201 and 2202.

2. This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331, 1338(a), 1338(b), and 2201.

3. This Court has ancillary subject matter jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

4. An actual controversy exists concerning Defendants' use of the Acton Academy intellectual property because Defendants intend to continue using Acton Academy's intellectual property, despite Plaintiff's prior, superior, and exclusive rights in and to the trademarked property. Further, Defendants are currently using and intend to continue using Plaintiff's confidential and proprietary trade secrets without Plaintiff's permission or consent, over Plaintiff's objection, and to Plaintiff's detriment.

5. Venue is proper in this District pursuant to 28 U.S.C. §1391 because one or more Defendants reside in this District, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## II. PARTIES

6. Plaintiff Acton Academy is a domestic nonprofit corporation with its principal office in Austin, Travis County, Texas.

7. Tim Kennedy ("Kennedy") is an individual who may be served with process at his place of business at 12129 N. FM 620, Suite 650, Austin, Texas 78750, or wherever he may be found.

8. Apogee TX High Plains, LLC ("Apogee TX High Plains") is a Texas limited liability company with its principal office located at 8180 W. McCormick Rd, Amarillo, TX

79119. Service of process may be effectuated by serving this entity's registered agent, Rebecca Wehust, at 8180 W. McCormick Rd, Amarillo, TX 79119, or wherever she may be found.

9. Apogee Denton, LLC ("Apogee Denton") is a Texas limited liability company with its principal office located at 6101 Countess Ln., Denton, TX 76210-76210. Service of process may be effectuated by serving this entity's registered agent, Lindsey R. Jarrett, at 6101 Countess Ln., Denton, TX 76210-76210, or wherever she may be found.

10. Cameron Penn and Lauren Penn d/b/a Apogee North Texas (collectively, "Apogee North Texas") are individuals who may be served with process at 2140 E Southlake Blvd, Ste L822, Southlake, TX 76092, or wherever they may be found.

11. Apogee Farmersville 719 Education Center, LLC ("Apogee Farmersville") is a Texas limited liability company with its principal office located at 2737 Naomi Ct., Farmersville, TX 75442. Service of process may be effectuated by serving this entity's registered agent, Ashley Dion Reynolds Eiser, at 2737 Naomi Ct., Farmersville, TX 75442, or wherever she may be found.

12. Fattig Business Development Services, LLC d/b/a Apogee League City East ("Apogee League City East") is a Texas limited liability company with its principal office located at 202 N. Park Avenue, League City, Texas 77573. Service of process may be effectuated by serving this entity's registered agent, Harold Fattig, at 2740 Ahnya Ln., League City, TX 77573, or wherever he may be found.

13. Apogee Lockhart Life Learning Center, LLC ("Apogee Life Learning Center") is a Texas limited liability company with its principal office located at 1205 Blackjack St., Lockhart, TX 78644. Service of process may be effectuated by serving this entity's registered agent, United States Corporation Agents, Inc., at 10601 Clarence Dr., Suite 250, Frisco, TX 75033, or wherever it may be found.

14. Apogee Strong San Antonio, LLC ("Apogee Strong San Antonio") is a Texas limited liability company with its principal office located at 1240 Loma Ranch, New Braunfels, TX 78132-3456. Service of process may be effectuated by serving this entity's registered agent, United States Corporation Agents, Inc., at 10601 Clarence Dr., Suite 250, Frisco, TX 75033 or wherever it may be found.

15. Doug Moreland and Suzane Moreland d/b/a Apogee Fort Davis ("Apogee Fort Davis") are individuals who may be served with process at 400 Madrone St., Fort Davis, TX 79734, or wherever they may be found.

16. Apogee Keller, LLC ("Apogee Keller") is a Texas limited liability company with its principal office located at 5473 Blair Rd., Ste 100 # 554700, Dallas, TX 75231-4227. Service of process may be effectuated by serving this entity's registered agent, United States Corporation Agents, Inc., Registered Agent, at 10601 Clarence Dr., Suite 250, Frisco, TX 75033, or wherever he may be found.

17. Jason Herrick d/b/a Apogee HOCO ("Apogee HOCO") is an individual who may be served with process at 4261 Bethel Overlook, Ellicott City, MD 21043, or wherever they may be found.

18. Apogee New Jersey, LLC ("Apogee New Jersey") is a New Jersey limited liability company with its principal office located at 262 Mountain Way, Rutherford, New Jersey 07070. Service of process may be effectuated by serving this entity's registered agent, Christopher Della Fave, at 262 Mountain Way, Rutherford, New Jersey 07070, or wherever he may be found.

19. Apogee by the Sea NJ, LLC ("Apogee by the Sea") is a New Jersey limited liability company with its principal office located at 144 Besante Blvd., Brick, New Jersey 08724. Service of process may be effectuated by serving this entity's registered agent, Kelsey Vitillo, at 144 Besante Blvd., Brick, New Jersey 08724, or wherever she may be found.

20. Apogee Buckeye Lake, LLC ("Apogee Buckeye") is an Ohio limited liability company with its principal office located at 3029 Maple Avenue NE, Millersport, Ohio 43046. Service of process may be effectuated by serving this entity's registered agent, Zachary Gorsuch, at 3029 Maple Avenue NE, Millersport, Ohio 43046, or wherever he may be found.

21. Kingsbridge Academy d/b/a Apogee Dayton ("Apogee Dayton") is an Ohio place of business with its principal office located at 6805 Ross Road, New Carlisle, OH 45344. Service of process may be effectuated by serving this entity's registered agent, Mark D. Wahl, at 6805 Ross Road, New Carlisle, OH 45344, or wherever he may be found.

22. Teaching to the Heart, LLC d/b/a Apogee Cincinnati ("Apogee Cincinnati") is an Ohio limited liability company with its principal office located at 2527 Compton Rd., Cincinnati, OH 45231. Service of process may be effectuated by serving this entity's registered agent, Erika Horsley, at 2527 Compton Rd., Cincinnati, OH 45231, or wherever she may be found.

23. Apogee Gahanna, LLC ("Apogee Gahanna") is an Ohio limited liability company with its principal office located at 772 Old Forest Ct., Gahanna, OH 43230. Service of process may be effectuated by serving this entity's registered agent, Brian Walsh, at 772 Old Forest Ct., Gahanna, OH 43230, or wherever he may be found.

24. Apogee 926, LLC ("Apogee 926") is a North Carolina limited liability company with its principal office located at 11235 Sam Furr Road, Ste 102, Huntersville, NC 28078-8215. Service of process may be effectuated by serving this entity's registered agent, Jacob. W. Norris, at 11235 Sam Furr Road, Ste 102, Huntersville, NC 28078-8215, or wherever he may be found.

25. Apogee Strong Anson, LLC ("Apogee Anson") is a North Carolina limited liability company with its principal office located at 700 Jacks Branch Rd., Wadesboro, NC 28170-8184. Service of process may be effectuated by serving this entity's registered agent, Matthew Eric Carpenter, at 700 Jacks Branch Rd., Wadesboro, NC 28170-8184, or wherever he may be found.

26. Apogee Charlotte County, LLC ("Apogee Charlotte") is a Florida limited liability company with its principal office located at 422 Lindon St., Port Charlotte, FL 33954. Service of process may be effectuated by serving this entity's registered agent, Robert Lance Morris, at 422 Lindon St., Port Charlotte, FL 33954, or wherever he may be found.

27. Apogee Strong Orlando, LLC ("Apogee Strong Orlando") is a Florida limited liability company with its principal office located at 2521 Colony Ave., Kissimmee, FL 34744. Service of process may be effectuated by serving this entity's registered agent, Nicholas A. Montes, at 2521 Colony Ave., Kissimmee, FL 34744, or wherever he may be found.

28. Educational Freedom, LLC d/b/a Apogee Odessa ("Apogee Odessa") is a Florida limited liability company with its principal office located at 7901 4th St. N. 300, St. Petersburg, FL 33702. Service of process may be effectuated by serving this entity's registered agent, Registered Agents, Inc., at 7901 4th St. N. 300, St. Petersburg, FL 33702, or wherever it may be found.

29. Apogee San Diego, LLC ("Apogee San Diego") is a California limited liability company with its principal office located at 1545 River Park Drive, Sacramento, CA 95815. Service of process may be effectuated by serving this entity's registered agent, 1505 Corporation Universal Registered Agents, Inc., at 1545 River Park Drive, Sacramento, CA 95815, or wherever it may be found.

30. Apogee Tahoe, LLC ("Apogee Tahoe") is a California limited liability company with its principal office located at 1034 Emerald Bay Rd. #408, South Lake Tahoe, CA 96150. Service of process may be effectuated by serving this entity's registered agent, Ashley Nichols, at 1034 Emerald Bay Rd. #408, South Lake Tahoe, CA 96150, or wherever she may be found.

31. Apogee Summit Colorado, LLC ("Apogee Summit Colorado") is a Colorado limited liability company with its principal office located at 19530 Belatrix Dr., Monument, CO

80132. Service of process may be effectuated by serving this entity's registered agent, Gwendolyn Roewer, at 19530 Belatrix Dr., Monument, CO 80132, or wherever she may be found.

32. Apogee Strong Colorado Holdings d/b/a Apogee Strong Denver ("Apogee Denver") is a Colorado limited liability company with its principal office located at 1160 S. Harlan St., Lakewood, CO 80232. Service of process may be effectuated by serving this entity's registered agent, Louis Pineda, at 1160 S. Harlan St., Lakewood, CO 80232, or wherever he may be found.

## V. CONDITIONS PRECEDENT

34. Plaintiff would show that all conditions precedent have been performed or waived.

## VI. OVERVIEW/SUMMARY OF DISPUTE

35. This case is about restoring to Acton Academy its rightful ownership and control of its proprietary and confidential trade secrets, materials, intellectual property rights and associated goodwill. Acton Academy is a transformative K-12 "learner-driven" educational movement and organization, and its learning design is legally protected and secured by various materials, including, but not limited to, its *Trademark License Agreement* and *Access and License Agreement,* which all affiliates are required to acknowledge and follow. Defendants -- having gained access to Acton Academy's learning materials through previous relationships with Acton Academy, by way of which they are bound by Acton Academy's *Trademark License Agreement* and *Access and License Agreement* – are utilizing and misappropriating Acton's name, trademark, trade secrets, and goodwill without authorization and for purpose and use outside of the *Trademark License Agreement* and *Access and License Agreement*, and in violation of Texas and Federal law.

## VII. FACTUAL BACKGROUND

### <u>A. Plaintiff and Plaintiff's Proprietary Materials</u>

### 1. Acton Academy and Acton Model

36. Acton Academy is a 501(c)(3) entity and a transformative K12 "learner-driven" educational movement and organization that Jeff Sandefer and Laura Sandefer founded in 2009 in Austin, Texas. The Declaration of Laura Sandefer (attached hereto as Exhibit A), who is the President for Acton Academy, provides an overview of Acton Academy's history, philosophy, and market achievements.

37. While not comprehensive, the following briefly details several key Acton Academy components:

- **<u>A Day in the Studio</u>**: Each day begins in a multi-aged "studio" (Spark at the preschool level; Studio at the elementary/middle school level; and Launchpad at the high school level) led by a "guide" or learners with a "Socratic launch" to develop and sharpen critical thinking. Following the morning launch, learners tackle self-paced Core Skills like math, writing and reading (D.E.A.R. – "drop everything and read"). After lunch, there is another Socratic discussion; then a hands-on quest designed to hone real world skills and a closing Socratic launch.

- **<u>No Homework / Progress "Badges"</u>**: Acton promises parents "no homework" and there are "no grades" – instead progress is measured by a series of badges, often focused on real world skills and featuring "Servant Leadership," an Acton term for serving others, often between studios. Socratic launches and contracts between learners, guides, owners and parents lead to strong character development and a tightly bound community.
Learners generally advance at their own pace but ultimately have to display mastery of the area they are studying. Mastery is demonstrated by earning badges.

- **<u>Independent Work on Core Skills</u>**: Learners generally spend the morning working on core skills, like math, reading, and writing. While varied by location, most campuses recommend one or two of several online programs.

- **<u>Collaborative Work on More Integrative Topics</u>**: Acton promises learners will "learn to learn" – which means to learn the recipes and processes to accomplish a goal; "learn to do" to deliver work with real world value, and "learn to be" to find a calling that will change the world. "Learning to know" – in other words memorization and regurgitation is not a goal. Learners work with Running Partners; squads; studios and campus-wide quests on complex, collaborative four-to-six-week quests that end with public exhibition (see below.)

- **<u>Quests</u>**: The most significant collaborative projects are called “quests,” a series of five- or six-week long challenges that are framed under in compelling narrative and explore a wide variety of integrative topics." Elementary school quests included topics like coding and robotics, community gardens, entomology, architecture, marine science, cartography, and Thomas Edison's Lab. Middle school quests include topics such as the trial of Socrates, medical research, behavioral economics, rocketry, entrepreneurship, and sales.

- **<u>Children's Business Fairs</u>**: The Acton Children's Business Fair originally begun in 2007 (before Acton even opened), the idea came from the Sandefers' own children who organized the first fair in the Sandefers' yard. The fair has come to be a critical part of the curriculum at many Acton Academies. As of the summer of 2020, more than 30,000 children have participated in over 600 fairs in 13 countries.

- **<u>Apprenticeships</u>**: Beginning in middle school, students pursue and complete an apprenticeship each year.

- **<u>Journey Tracker</u>**: Learners track their progress using Journey Tracker, Acton Academy's proprietary studio software program. It helps learners set, coordinate, track, and store weekly challenge progress, SMART goals (Specific, Measurable, Attainable, Relevant, Timebound), points, badges earned, badge plans, and peer reviews. Guides have access to the Journey Tracker dashboard, and learners are encouraged to provide their parents access as well.

38. Acton Academy’s learning design includes over 20,000 pages of interwoven proprietary materials, including unique and original examples, frameworks, processes, recipes, systems schedules, maps, contracts, audition funnels, challenges, and launches for learners, parents, guides, and owners. This includes over 1100 custom Socratic launches and over 350 custom Civilization case discussion templates alone captured in The Playbook – an online secure storage system open only to authorized affiliates and their employees; and Journey Tracker, a proprietary learning management system protected by secure password protocols. These materials are collectively referred to herein as “the Acton Materials.”

39. The Acton Materials and content are legally protected and secured by multiple documents/agreements, including, but not limited to, its *Welcome Letter, Trademark License*

*Agreement, and Access and License Agreement*. These documents/agreements, which are further discussed below, must be acknowledged and accepted for an affiliate or its employees to access Acton Academy's learning design and content.

**2. Acton Academy Agreements**

40. Acton Academy's *Trademark License Agreement* provides, in relevant part, the following:

> *Licensor is the owner of all rights, title, and interest in and to the name and trademark "ACTON ACADEMY" and all goodwill associated therewith (the "Name");*
>
> *[ * * * ]*
>
> *2. Goodwill.*
>
> *Licensee recognizes the great value of the goodwill associated with the Name and acknowledges that the Name and the goodwill pertaining thereto belong exclusively to Licensor. Licensee shall not during the Term of this Agreement, or thereafter, attack the title or any right or interest of Licensor in and to the Name or attack the validity of this License.*
>
> *[ * * * ]*
>
> *5. Use of Name by Licensee.*
>
> *a. Licensee shall select its name for business operations according to one of the two following options, subject to approval by Licensor: (i) "Acton Academy [city]" . . . or (ii) Any name without the word "Acton", in which case Licensee may choose to identify itself as "[unique name"]: An Acton Academy". Licensee's choice of name: ________________"*
>
> *b. Licensee shall only use the Name as the name of the Academy and, incidental to the use as the name of the Academy, to identify any of the educational and related services offered at the Academy. No other uses are permitted.*
>
> . . .
>
> *d. Registration of Domain Names. As a license of the Name, Licensee is permitted to use the Name in connection with a single domain name to identify the Academy on the internet in accordance with the terms and conditions of this Section (the "Domain Name"), and otherwise in accordance with this Agreement.*

> *(i) Licensee shall choose one domain name, consistent with name chosen in 5(a). Licensee's choice of domain name: ____________"*
>
> *(ii) . . . Licensor own[s] all rights, title, and interest in and to the Domain Name.*
>
> *(iii) . . . Notwithstanding the foregoing, as owner of the Domain Name, Licensor reserves the right, in its sole and absolute discretion, to request that the Licensee disable a website or other content associated with the Domain Name and/or cancel the Domain Name registration in the event of a breach of this Agreement.*

. . .

*(g) Licensee's use of the Name in accordance with this Agreement shall inure to the benefit of Licensor.*

*[ * * * ]*

*7. Effect of Termination.*

*a. Upon and after the Termination of the Agreement, all rights granted to Licensee hereunder shall forthwith revert to Licensor, and within six ( 6) months following the Termination of the Agreement, Licensee will cease, and forever refrain from, all use or employment of the Name or anything deemed by Licensor to be similar to the Name, whether alone or in combination with any other word, symbol, or design, in connection with, without limitation, any and all advertising and promotional materials, signage, letterhead, printed materials, brochures, emblems, domain name uses including the Domain Name and all content associated therewith, email advertising, email messages, phone solicitation and phone answering, telephone directories and listings, visible pages of any website or electronic bulletin board, metatags and search keywords.*

*b. At the Termination of this Agreement, Licensee shall be deemed to have assigned, transferred and conveyed to Licensor any right in and to the Name, and any associated goodwill, which may have been obtained by Licensee, or which may have vested in Licensee in pursuit of offering goods or services, or through use of the Name in accordance with this Agreement, and Licensee shall execute any instruments requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement.*

41. In sum, the *Trademark License Agreement* provides for the restricted, limited use of "Licensor" Acton Academy's trademarked "Acton Academy" name and all associated goodwill,

the restricted, limited use of a specific Licensee name, and the restricted, limited use of a specific Licensee domain name.

42. The *Access and License Agreement*—which is between Acton Academy as the "Provider" and a given Acton Academy affiliate as the "Customer"—provides for the restricted and limited access and use of the Acton Materials and content. The *Access and License Agreement* defines the "*Authorized Users*" who are subject to its terms to include the following:

> "*Authorized Users" means Customer's employees, teachers, instructors, administrators, consultants, contractors, students, and agents (i) who are authorized by Customer to access and use the Services under the rights granted to Customer pursuant to this Agreement and (ii) for whom access to the Services has been purchased hereunder.*

43. It further specifically defines, "Documentation," "Provider IP," and "Provider Content":

> *(c) "Documentation" means Provider's user manuals, handbooks, and guides relating to the Services provided by Provider to Customer either electronically or in hard copy form.*
>
> *[ * * * ]*
>
> *(e) "Provider IP" means the Services, the Documentation, Provider Content, and any and all intellectual property provided to Customer or any Authorized User in connection with the foregoing or anything created as a result of this Agreement.*
>
> *(f) "Provider Content" means learning content that Provider provides to its Customers through the Services, including, but not limited to, learning design content curriculum, discussion outlines, assignments, lesson plans, course outlines, school and studio processes, user contributions and submissions (i.e., examples of past student work), marketing materials, emails, templates, frameworks, notes, videos, case studies, and handbooks created by Provider for Customer and Authorized User's use with the Services.*

44. The limited right to access use Acton Academy's Customer Data, Documentation, Provider IP, and Provider Services, and Services – as set forth and as defined in the *Access and License Agreement* – are granted to the Customer and the Customer's Authorized Users subject to

certain terms and restrictions. Among other things, the *Access and License Agreement* includes the following use restrictions and Customer obligations:

> *2. <u>Access and Use.</u>*
>
> . . .
>
> *(c) Use Restrictions. Customer shall not use and shall prohibit its Authorized Users from using the Services for any purposes beyond the scope of the access granted in this Agreement. Customer shall not at any time, directly or indirectly, and shall not permit any Authorized Users to: (i) copy, modify, or create derivative works of the Services or Documentation, in whole or in part; (ii) rent, lease, lend, sell, license, sublicense, assign, distribute, publish, transfer, or otherwise make available the Services or Documentation; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part; (iv) remove any proprietary notices from the Services or Documentation; (v) use the Services or Documentation in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law (vi) transmit, or procure the sending of, any advertising or promotional material, including any "junk mail", "chain letter" or "spam" or any other similar solicitation… Use of Provider Content shall be restricted for use only in connection with recruiting and advertising of Customer's services and further, such disclosure shall be limited only to discrete portions of Provider Content sufficient to aid such recruiting and advertising.*
>
> *[* * *]*
>
> *3. Customer Responsibilities. Customer is responsible and liable for all uses of the Provider IP and Customer Data resulting from access provided by Customer, directly or indirectly, whether such access or use is permitted by or in violation of this Agreement. Without limiting the generality of the foregoing, Customer is responsible for all acts and omissions of all Authorized Users, and any act or omission by an Authorized User that would constitute a breach of this Agreement if taken by Customer will be deemed a breach of this Agreement by Customer. Customer shall use reasonable efforts to make all Authorized Users aware of this Agreement's provisions as applicable to such Authorized User's use of the Services, and shall cause Authorized Users to comply with such provisions.*
>
> *[ * * * ]*
>
> *6. Confidential Information. From time to time during the Term, either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential*

> *information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media [in written or electronic form or media], whether or not marked, designated or otherwise identified as "confidential" (collectively, "Confidential Information"). . . . The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees or authorized persons who have a need to know the Confidential Information for the receiving Party to exercise its rights or perform its obligations hereunder… On the expiration or termination of the Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed. . . .*

45. The *Access and License Agreement*, further contains the following termination provision:

> *(c) Effect of Expiration or Termination. Upon expiration or earlier termination of this Agreement, Customer shall and shall require its Authorized Users to immediately discontinue use of the Provider IP and, without limiting Customer's obligations under Section 6, Customer shall, and shall require its Authorized Users to delete, destroy, or return all copies to the Provider IP and certify in writing to the Provider that the Provider IP has been deleted or destroyed.*

46. As is set forth more particularly hereinbelow, Defendant Tim Kennedy—as well as Kennedy's associate, Matt Beaudreau ("Beaudreau"), and the entity founded and owned by Kennedy, Apogee Cedar Park, LLC d/b/a Apogee Cedar Park ("Apogee Cedar Park")—acknowledged and agreed to Acton Academy's *Trademark License Agreement* and *Access License Agreement*. Accordingly, Defendant Kennedy, Beaudreau, and the network of related Apogee entities that have since been developed by Kennedy and Beaudreau through use of the Acton Academy provided materials, are bound by the terms contained therein.

**B. Plaintiff's Relationships with Kennedy, Beaudreau, and Apogee Cedar Park**

47. In 2017, Beaudreau launched an Acton Academy affiliate in Placer, California followed by two more campuses. In 2022, Acton Academy engaged and paid Beaudreau for

several months to promote Acton Academy on podcasts. (Acton Academy sometimes paid Acton Academy owners for certain work on a contract/per job basis). Beaudreau contributed little to nothing to Acton Academy's learner design or the creation of the network.

48. Acton Academy Placer – the Acton campus that Beaudreau represented he owned and the name under which Beaudreau did business in Texas – signed and accepted the terms of Acton Academy's *Access and License Agreement*. Beaudreau and Acton Academy also signed and entered Acton Academy's *Trademark License Agreement*. Pursuant to and in reliance upon Acton Academy Placer's execution and agreement – including Beaudreau's acceptance and ratification of the *Access and License Agreement* and *Trademark License Agreement* by, through and under Acton Academy Placer, as well as directly and individually – Acton Academy allowed and provided Acton Academy Placer and Beaudreau access to and use of the Acton Academy Materials and content. At all relevant times, Beaudreau was (and continues to be) fully aware that he had access to the Acton Academy Materials and content only by, through, and under the terms of Acton Academy's *Access and License Agreement* and *Trademark License Agreement* which Beaudreau ratified and adopted when he accessed and utilized Acton Academy's materials and content.

49. In 2020, Acton Academy approved Kennedy to open an Acton Academy campus he called "Apogee: an Acton Academy", which Kennedy consistently referred to as "Apogee Cedar Park" or "Apogee Cedar Park, an Acton Academy." Kennedy and Apogee Cedar Park signed and accepted the terms of Acton Academy's *Trademark License Agreement* effective November 9, 2020, and Kennedy signed and accepted the terms of Acton Academy's *Access and License Agreement* 11/11/20. In the *Trademark License Agreement* with Apogee Cedar Park and Kennedy, they agreed to the limited use of the Academy name "Apogee an Acton Academy", and further opted to use the following Acton Academy owned Domain Name, "Apogeecedarpark.com."

50. Apogee Cedar Park and Kennedy agreed to the limited and restricted right to use the Acton Materials and content, and agreed to the limited and restricted right to use the Acton Academy trademark name and domain name as set forth in the provisions of the *Trademark License Agreement* and *Access and License Agreement* detailed above.

**C. Acton Academy's Termination of Beaudreau and Kennedy from the Acton Academy Network**

51. Acton Placer – an Acton Academy affiliate near Sacramento – terminated Beaudreau for cause in mid-2022, and after additional investigation, Acton Academy terminated all of Beaudreau's relationships with Acton Academy and the Acton network.

52. Also in mid-2022, Acton Academy terminated Kennedy's Acton Academy license for non-compliance under the terms of the agreement.

53. As a result of the terminations, and per the Acton Academy *Welcome Letter, Trademark License Agreement* and *Access and Use Agreement* that both Kennedy and Beaudreau had signed, Kennedy and Beaudreau – and their affiliates – were required to "immediately discontinue use of" Acton Academy materials, "delete, destroy, or return all copies of" Acton Academy materials, and "certify in writing to [Acton Academy] that the [Acton Materials] ha[ve] been deleted or destroyed." In addition, per the *Trademark License Agreement*, upon termination, they also (1) were required to "cease, and forever refrain from, all use or employment of" the Acton Academy name or "anything deemed by Licensor to be similar to" the Acton Academy name, "whether alone or in combination with any other word, symbol, or design"; and (2) agreed "to have assigned, transferred and conveyed to [Acton Academy] any right in and to" the Acton Academy Name, "and any associated goodwill, which may have been obtained by Licensee, or which may have vested in Licensee in pursuit of offering goods or services, or through use of [the Acton Academy Name] in accordance with this Agreement[.]" Among other things, this means

that, upon termination, Kennedy, Beaudreau, and their affiliates were not permitted to utilize the "Apogee" and "Apogee Cedar Park" name in connection with providing K-12 educational services, were not permitted to utilize the Acton Academy owned domain name apogeecedparpark.com in connection with providing K-12 educational services, and were not permitted to continue to utilize the Acton Material or content in provision of said services.

54. To date, neither Kennedy, Beaudreau, Apogee Cedar Park, nor any Apogee entity or affiliate have certified in writing that all relevant and protected Acton Academy materials have been deleted or destroyed, and no such materials have been returned. Further, Kennedy and Apogee Cedar Park continue to use the apogeecedarpark.com in the provision of educational services, and as detailed below, Kennedy and Beaudreau have launched a national competing educational network using the "Apogee" name and the Acton Materials and content.

**D. The Apogee Entities**

55. Post-termination, despite the provisions of the *Trademark License Agreement* and the *Access and Use Agreement*, Kennedy continued to—and to this day continues to—operate a school in Cedar Park called "Apogee Cedar Park", without Acton Academy's consent. Further, Acton Academy has learned that many of its uniquely interwoven words and phrases, and other structures and elements of the Acton Academy learning design that Acton Academy authored and created, and that are unusual, unique, proprietary, and not seen in combination in other programs are, currently being used by entities organized and/or controlled by Beaudreau and Kennedy, also under the name of "Apogee", and their affiliated schools (including Apogee Cedar Park"), without Acton Academy's approval or consent.

56. More specifically, sometime in 2023 or 2024, Beaudreau and Kennedy—under the umbrella of their organization Apogee Strong, LLC—launched the Apogee school network, not

only using the name "Apogee", but also using the central terms, structures, frameworks and schedules identical to (or thinly disguised versions of) Acton Academy's content. This school network includes over 75 Apogee schools nationwide, is prominently featured on the website for Apogee Strong, LLC[1]—a for-profit entity with Beaudreau and Kennedy as key principals—and includes many schools that compete in the same markets as Acton Academy.

57. Among other things, upon beginning the Apogee school network, Beaudreau and Kennedy (1) misrepresented Beaudreau's connection with development of Acton Academy, thereby misrepresenting and conflating the subsequent Apogee school brand as associated with Acton Academy; (2) misappropriated and impermissibly utilized (and on information and belief, continue to utilize) Acton Academy's proprietary and trademarked learning design and materials, including via, on information and belief, direct use of the Acton Materials and via lifting key Acton Academy words, phrases, and concepts for use, often verbatim, on Apogee school websites and online content, and (3) impermissibly continued to, and to this day continue to, utilize the term "Apogee" to deliver substantially similar K-12 educational services in competition with Acton Academy after having garnered significant goodwill and brand recognition in the educational space via the limited authorization to use the term "Apogee" in connection with operating "Apogee an Acton Academy" and providing related Acton Academy educational services.

58. To illustrate the misrepresentation of Beaudreau's involvement with Acton Academy, below is a statement made by Beaudreau during a November 24, 2022 episode of the "Life on Target" podcast, in which he describes his alleged origins and involvement with Acton:

> [U]ltimately I had to do something different not just because I saw that it was the right thing but at that time I had children of my own and knowing what I know there was no way I was going to send them into what I now semi-affectionately call the conveyor belt school model **so I started building campuses of my own and I**

[1] apogeestrong.com/apogee-schools

> **started inviting other families to come along and I was extraordinarily grateful to see that other families saw the same need one campus turned into three and in the process I was able to help almost 200 other entrepreneurs bring campuses to their family that's kind of put us to where we are now** even helping these other entrepreneurs it was underneath somebody else's umbrella where there were just some small details where we went gosh I can see ways to make it better … (Id at 00:59:46)[2]

59. Beaudreau has made similar claims on other platforms, through which he creates the false impression that Beaudreau had a major role in developing the Acton Academy model and/or launching Acton Academy's growth, including involvement in launching hundreds of Acton Academy campuses. On information and belief, from the inception of developing Apogee, Beaudreau and Kennedy were attempting to associate, and did associate, Apogee with Acton Academy and the Acton Academy model to assist the launch and growth of the Apogee school network in direct competition with Acton Academy.

60. Of note, both Beaudreau and Kennedy have continued to associate themselves and/or Apogee as affiliated with Acton. For instance, until this month, Beaudreau's LinkedIn page still listed him as affiliated with Acton Placer:


Education Innovator, School Founder, Speaker
Acton Placer, Art of High Impact Homeschooling, Center for Generational Kinetics
Aug 2007 - Present · 17 yrs 1 mo

And Kennedy's Wikipedia page — https://en.wikipedia.org/wiki/Tim_Kennedy_(fighter) — continues to directly connect Apogee Cedar Park to Acton Academy:

> **"In 2021, Kennedy opened a charter school in Austin, Texas called Apogee Cedar Park. The school is built off the Acton Academy model which emphasizes student-led learning through Socratic discussion and real work projects. The school is currently open for preK through 6th grade, with plans to expand to middle school children in fall of 2024."**

[2] *Life on Target*, Ep. 53, "School—A Religion You Should Quit with Matt Beaudreau" (Nov. 4, 2022) at timestamp 59:46.

61. Of note, what makes the false representations that Beaudreau and Kennedy played a major role in developing Acton Academy particularly egregious is the degree to which their "new" educational system copies the Acton model. To clarify, Kennedy and Beaudreau's Apogee school network largely duplicates Acton Academy's school network.

62. Among other things, and as detailed in the Declaration of Laura Sandefer (attached hereto as Exhibit A) and the attached correspondence between Acton Academy's counsel and Beaudreau/Kennedy, numerous key Acton Academy words, phrases, and concepts were directly lifted from Acton Academy's website and materials for use on Apogee websites. These lifted materials evidence, and Plaintiff now asserts, that Defendants intended to offer and are offering the unique Acton model with integrated-age "studios" of "learners" engaging in daily "Socratic launches" with a core focus on project-based learning for 4 to 6 week "sprints", that end with students presenting public exhibitions of their work. Beaudreau and Kennedy have expressly admitted to lifting the following Acton Academy content and using it on Apogee websites and/or online content:

| ACTON ACADEMY CONTENT USED BY APOGEE | BEAUDREAU/KENNEDY RESPONSE |
|---|---|
| "Equip" learners to "develop their God given talents and gifts" is lifted almost verbatim from Acton's content. | "Definitely leftover remnants of the old Acton website, and should be removed." |
| Language referring to children as "geniuses" who will "find a calling" and "change the world" is lifted almost verbatim from Acton's mission statement and promises. | "Definitely leftover remnants of the old Acton website, and should be removed." |
| Apogee's daily schedules seem to be appropriated directly from Acton, including 2-13 "Socratic launches" in a day, D.E.A.R. ("Drop everything and read time" and "Core Skills" in the morning and "Quests" in the afternoon. Acton created these combinations | "That was or is to be taken off of the website . . . We won't be using "Socratic launches", "DEAR", or "Quests." Those were all remnants of the old Acton site that have been/are being removed." |

| | |
|---|---|
| of activities and established several of the terms. | |
| "We believe children are far more capable than you ever imagined" – this is an original Acton phrase Apogee appropriated from Acton's website. Acton has documented at least ten examples of Apogee using this unique phrase in Apogee's promotional materials. | "Definitely remnants of the olde Acton website, and should be removed." |
| Apogee FAQ text often is appropriated verbatim from Acton website. For example, an Apogee answer to a question about Montessori methods is copied directly from Acton's Website. | "Definitely remnants of the old Acton website, and should be removed." |
| Apogee language for job postings is appropriated directly from Acton's job postings. | "Definitely remnants of the old Acton website, and should be removed." |
| "We believe that learning to do; learning to be and learning to learn are more important than memorization alone – learning to know" – this is copied word for word from Acton's Belief. | "Definitely remnants of the old Acton website, and should be removed." |
| Apogee's Children Business Fair – this is a direct appropriation from Acton's Children's Business Fair. | "Definitely remnants of the old Acton website, and should be removed." |
| Apogee: "Our mission is to inspire each person who enters our doors to find a calling and change the world" – this is copied verbatim from Acton's mission statement. | "Definitely remnants of the old Acton website, and should be removed." |

63. Plaintiff is aware that at least some of the admitted violations above continue to appear on certain Apogee school platforms, including the following from Defendant Apogee by the Sea and Defendant Apogee New Jersey:



[3]



[4]

64. To date, Acton Academy has identified the following Acton Academy words and phrases that are unique to Acton Academy and uniquely identify and distinguish Acton Academy services and products that Defendants have misappropriated and used for commercial use:

- *The Hero's Journey*- the key organizing concept for Acton's learning design. (Acton Academy is the only K12 school that uses this as its organizing principle).
- "*Learner-driven*" as a term to describe the educational approach and used rarely if at all by other schools.
- Labeling students as "*Hero's*" or "*Learners*." Acton is the only school that on information and belief uses these terms
- "*Equip*" learners to "*develop their God given talents and gifts*" - almost verbatim from Acton's content.
- Language referring to children as "*geniuses*" who will "*find a calling*" and "*change the world*" - almost verbatim from Acton's mission statement and promises.
- "*Guides*" as a word for "*teacher*." Referring to a teacher as a "*guide*" or "*Socratic guide*" are terms used by Acton.
- Small mixed age classrooms called "*studios*" which is a term used by Acton.

---

[3] https://apogeebytheseanj.org/
[4] https://apogeestrongnj.com/welcome-1030-9655-4100

- "*A badge system*" to "*track progress*" and a promise of "*no grades*" - directly from Acton.

- "*Servant Leadership*" is a term to describe learners in one studio serving another.

- An 11-month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "*quests*" to develop real world skills (all Acton Academy concepts and procedures)

- Apogee's daily schedules and unique program terms seem to be appropriated directly from Acton, including 2 – 3 "*Socratic launches*" in a day, D.E.A.R ("Drop everything and read time" and "*Core Skills*" in the morning and "*Quests*" in the afternoon. Acton created these combinations of activities and established several of the terms.

- "*We believe children are far more capable than you ever imagined*" – this is an original Acton phrase Apogee appropriated from Acton's website. Acton has documented at least ten examples of Apogee using this unique phrase in promotional materials.

- *"Peace corner"* – a term used in Acton studios.

- "*We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know*" – copied word for word from Acton's beliefs.

- *"Children's Business Fair"* – direct appropriation from Acton's Children's Business Fair.

- "*Our mission is to inspire each person who enters our doors to find a calling and change the world*" – this is copied verbatim from Acton's mission statement.

65. The above terms and phrases are collectively referred to herein as the "Acton Trademark Terms."

66. As further evidence of the Apogee school entities misappropriation and use of the Acton Material and content, one Apogee school—Apogee Sacramento—released a video on March 26, 2024 that details the plan for the Apogee school program to be launched "at more than 50 campuses across the country in the fall."[5] This video is still posted online and can be viewed via the hyperlink cited herein in footnote 5. The video—titled "Apogee Sacramento Virtual Information Session"—evidence that now and since their inception, Apogee schools,

[5] *See* "Apogee Sacramento Virtual Information Session" (Mar. 26. 2024), https://www.youtube.com/watch?v=4f-TxuGV5pI, at time stamp 30:45 – 30:51.

(1) are based on the Acton model—i.e., "Acton Academy is a proven innovative educational model that is inspiring a lot of what we are building with Apogee Sacramento . . . there are going to be a whole network where Matt [Beaudreau] is pulling from his experience from Acton, he is creating his own network-Apogee Schools, Apogee education centers starting across the country"[6];

(2) utilize "Mixed-Age Studios" with "guides" and "learners" holding daily "Socratic" discussions and "launches"—i.e., "Our team will act as guides and co-learners"; "Socratic discussions will be a part of our learning environment"; "Mixed-Age Studios . . . youngers and olders, they learn together"[7];

(3) measure progress or "mastery" of a skill/subject via earning "badges"—i.e. "our learners will earn badges as they learn to prove that they mastered a concept"[8];

(4) have a core-focus on project-based learning over 5-to-6-week periods with a specific exhibition of work at the end – i.e., "in the afternoons you'll see project based learning . . . it's really where academia becomes meaningful, its tied to projects, this is where they will always have a themed project that they are taking part in, which will go over the course of 5 to 6 weeks with a very specific exhibition of works at the end, like I mentioned with my son having the chemistry and cooking at Acton" (i.e., clearly the Acton Quest – i.e., "one example of project-based learning that my son Isac did at Acton Academy was . . .")[9];

(5) operate children's business fairs—i.e., "the littles will also be involved in creating their own businesses for the end of the year business fair . . . middle schoolers will also be involved in the business fair"[10]; and

(6) utilize learner internships and apprenticeships—i.e., "they will further enrich their development by engaging in internships, job shadows, and apprenticeships."[11]

**In other words, Beaudreau, Kennedy, and Defendants essentially copied and pasted the Acton Academy educational model, from soup to nuts, and launched a competing network**.

67. In sum, (1) Kennedy and Beaudreau obtained access to Acton Academy's confidential and proprietary materials and trade secrets through opening Acton Academy

[6] *Id*. at time stamp 30:00 – 30:50.
[7] *Id.* at time stamp 37:26 – 37:43; 37:42 – 38:37, 47:52 – 48:51; 49:21 – 49:41.
[8] *Id.* at time stamp 38:04 – 39:00.
[9] *Id.* at time stamp 32:39 – 33:55; 34:25 – 35:33, 50:54 – 51:20.
[10] *Id.* at time stamp 33:53 – 34:20, 45:10 – 30.
[11] *Id.* at time stamp 34:18 – 28, 35:31 – 36:37.

campuses and further obtained substantial goodwill and brand recognition through use of the term "Apogee" in connection with an Acton Academy; and then subsequently (2), without authorization, have used and are using that goodwill and the information and material provided by Acton Academy to launch, in coordination with Apogee school campuses and owners across the country, a directly competing educational network across the country.

68. The Apogee school network includes Defendants Apogee TX High Plains; Apogee Denton; Apogee North Texas; Apogee Farmersville; Apogee League City East; Apogee Life Learning Center; Apogee Strong San Antonio; Apogee Fort Davis; Apogee Keller; Apogee HOCO; Apogee New Jersey; Apogee by the Sea; Apogee Buckeye; Apogee Dayton; Apogee Cincinnati; Apogee Gahanna; Apogee 926; Apogee Anson; Apogee Charlotte; Apogee Strong Orlando; Apogee Odessa; Apogee San Diego; Apogee Tahoe; Apogee Summit Colorado; and Apogee Denver. These Apogee school defendants are collectively referred to herein as the "Apogee Entities."

69. To illustrate the extent of the misappropriation, trademark infringement, and contractual breach, the following is a screenshot from the Apogee Strong website depicting the location of the various Apogee schools:




12

70. When you click on each school's icon on the map, detailed information for that Apogee school is populated, inclusive of contact information and links to said school's website and social media accounts. For example, the following is populated when one clicks on the icon for Defendant Apogee North Texas:

[12] *See* Apogee Strong's website at https://apogeestrong.com/apogee-schools.




There are nearly identical promotions and links to all other Apogee schools, including the Apogee Entities.

71. Plaintiff specifically pleads that, by misappropriating Acton Academy's trade secrets and confidential and proprietary information, the Apogee Entities, have committed a tort in Texas within the meaning of Texas Civil Practice & Remedies Code § 17.042(2).

72. On information and belief, the Apogee Entities, knowingly received and used, and continue to use, the confidential and proprietary Acton materials and trade secrets as agents of, and through their contacts with, Kennedy and Beaudreau and, through Kennedy and Beaudreau's Texas contacts, including through the *Access and Agreement* and the *Trademark License Agreement*.

73. Of note, both the *Access and License Agreement (*§12(f)) and the *Trademark License Agreement* (§10) provide that the Agreements shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of laws principles.

74. Further, the confidentiality and trademark restrictions in of those Agreements survived termination, and breach of those Agreements are governed by the forum selection clauses:

- Trademark License Agreement, § 10: "Venue for any action arising under or in connection with this Agreement shall lie exclusively in Travis County, Texas."
- License and Access Agreement, § 12(f): "Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States or the courts of the State of Texas . . . ."

75. Defendants have obtained a direct benefit from the *License and Access Agreement* and *Trademark License Agreement*, and on information and belief, continue to enjoy said benefit in contravention of the express terms of those Agreements and Acton Academy's rights under those Agreements. Accordingly, in this suit to enforce the terms of said *License and Access Agreement* and *Trademark License Agreement*, the Apogee Entities are subject to the forum selection clause in those Agreements, and cannot avoid them, on direct benefits estoppel principles or otherwise.

**E. Defendants Acted in Concert**

76. For the avoidance of doubt, Plaintiff alleges that the Apogee Entities and Kennedy acted in concert and in combination with one another to misappropriate and use the Acton Material and content, including using confidential and proprietary Acton Academy trade secrets and materials, and including using and infringing on the Acton Academy trademarks, to launch a competing national educational services network through conversion of the Acton Academy Material and assets without compensation and in contravention of the express terms of the Access and License Agreement and Trademark License Agreement, which has caused Acton Academy injury.

### F. Acton Academy Damages

77. Acton Academy has been damaged by Defendants' actions as is apparent by the ongoing misappropriation and use of Acton Materials and trademark infringement and the establishment of a directly competing school network that is actively opening competing campuses across the country. Among other things, the use of the Acton Materials and appropriation of Acton Academy goodwill without authorization and without compensation amounts to conversion of Acton Academy property for which no monetary amount has been received, and through which Kennedy and the Apogee Entities have been unjustly enriched.

78. More specifically, the Apogee Entities and their students are paying money to Kennedy rather than paying money to the Acton Academy system, and the Apogee Entities are not paying the required 3% revenue share that is associated with operating an Acton Academy and use of the Acton Materials. To explain, when a school is set up as an Acton campus, the school pays a $20,000.00 fee to Acton Academy, and further agrees to pay 3% in future revenues to Acton Academy for the period the school operates as an Acton Academy. However, when Kennedy and the Apogee Entities set up a competing, copy-cat school in a given area, or perhaps worse, solicit an active Acton Academy to join Apogee, they are depriving Acton Academy of the ability to launch and/or maintain a campus in the area and receive the associated fee and revenue sharing. Further, on a more granular level, each student in a given area that enrolls in an Apogee campus rather than an Acton campus constitutes a loss of revenue to Acton Academy—i.e., a loss of the 3% tuition that would be going to Acton Academy during enrollment. Acton Academy has campuses in virtually every single market that Defendants / Apogee have a presence. Thus, nearly every student enrolling in an Apogee school represents a loss to Acton Academy. Moreover, in general, the Apogee Entities are using the Acton Materials and content without paying Acton

Academy in line with the standard Acton Academy contracted compensation terms, constituting conversion of Acton Academy assets.

79. Plaintiff further asserts that, through linking Apogee schools to Acton Academy—both through misrepresentations regarding the founders and through direct use of the Acton Materials and copying the Acton model—Defendants have harmed Acton Academy's goodwill and business reputation.

**G. Acton Registered Trademarks**

80. Acton Academy has the following registered trademarks:

- "Acton Academy" – US Serial Number 767169953; US Registration Number 4861387, for "Educational services, namely, providing courses of instruction at the primary and secondary levels and distribution of course materials."
- "Children's Business Fair" – US Serial Number 87515901; US Registration Number 5505100, for "Arranging and conducting entrepreneurs' exhibitions for business purposes; organization and holding of fairs for entrepreneurs for business purposes; organization of exhibitions for children for commercial or business purpose."
- "Acton Children's Business Fair" – US Serial Number 87516167; US Registration Number 5712031, for "Arranging and conducting entrepreneurs' exhibitions for business purposes; organization and holding of fairs for entrepreneurs for business purposes; organization of exhibitions for children for commercial or business purpose."

81. Plaintiff asserts that Defendants' actions as detailed in this pleading infringe on their registered trademark rights protected and recognized by the above registered trademarks ("Acton Registered Trademarks"). In particular, Plaintiff asserts that Defendants have used the Acton Academy name in promotional materials and online content to promote and sell their competing goods and services, including a children's business fair appropriated directly from

Acton. Plaintiff further asserts, on information and belief, that Defendants are using the Acton Registered Trademarks in their educational materials and in providing educational services to their customers.

## VIII. CAUSES OF ACTION

82. The foregoing paragraphs are incorporated in each of the specifically stated causes of action hereinbelow.

## FIRST CAUSE OF ACTION

### Breach of Contract

83. The actions on the part of Kennedy constitute breach of contract. Specifically, Kennedy has breached the obligations under Acton's Trademark License Agreement and Acton Academy's Access and License Agreement in that Beaudreau and Kennedy have utilized and copied Acton Academy's Customer Data, Documentation, Provider IP, Provider Content, Confidential Information, and Services.

84. The actions on the part of Kennedy constitute breach of contract. Specifically, Kennedy has breached his and Apogee Cedar Park's obligations under Acton Academy's Access and License Agreement in that Kennedy has (1) failed to certify in writing that all relevant Acton Academy materials have been deleted or destroyed; and (2) utilized and copied Acton Academy's Customer Data, Documentation, Provider IP, Provider Content, Confidential Information, and Services without authorization and for purposes and uses outside of the Acton Academy Access and License Agreement. Kennedy has also breached the terms of and violated his and Apogee Cedar Park's obligations under Acton Academy's Trademark License Agreement. Specifically, Kennedy and Apogee Cedar Park have utilized and misappropriated Acton Academy's name, trademark and goodwill without authorization and for purpose and use outside of the Trademark License Agreement and License and Access Agreement, including by the continued use of the

term "Apogee" and the domain name apogeecedarpark.com with Apogee Cedar Park and to launch a substantially similar educational services network nationwide.

85. These actions by Kennedy constitute material breach of the parties' contracts (including the Access and License Agreement and the Trademark License Agreement) because Kennedy failed to substantially perform material obligations under the contracts, thereby causing Plaintiff to sustain damages for which it seeks recovery by way of this suit. Plaintiff's damages are a natural, probable, and foreseeable consequence of the Defendants' breaches. Among other things, Plaintiff's damages include damage to business reputation and loss of goodwill by virtue of continued association and connection with Defendants and appropriation of goodwill in launching the Apogee network; misappropriation of trade secrets, trademarks, and confidential and proprietary materials without compensation along with the associated devaluation of Acton Academy / loss of good will; and direct damages resulting from loss of enrollment due to competition with Apogee Entities utilizing Acton confidential and proprietary materials.

86. Plaintiff seeks damages for Kennedy's breaches of the parties' agreements to date, and Plaintiff seeks specific performance under the Access and License Agreement and the Trademark License Agreement.

87. Further, pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, Plaintiff seeks recovery of its reasonable and necessary attorney's fees.

## SECOND CAUSE OF ACTION

### Violation of Lanham Act § 32, 15 U.S.C. § 1114

88. The acts of Defendants described above constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

89. Plaintiff owns valid and protectible registered rights in the Acton Registered Trademarks.

90. On information and belief, Defendants had actual knowledge of Plaintiff's ownership and use of the Acton Registered Trademarks prior to Defendants' copying, adoption, and use of the Acton Registered Trademarks and confusingly similar variations of the Acton Registered Trademarks in connection with the promotion and sale of its products and services.

91. Plaintiff has not authorized Defendants to use the Acton Registered Trademarks, and Defendants' use of the Acton Registered Trademarks has resulted in Defendants unfairly and unlawfully benefiting from Plaintiff's goodwill.

92. Defendants' unauthorized use and promotion of the Acton Registered Trademarks are causing confusion, and will likely continue to cause confusion, mistake, or deception on the part of consumers as to the source, nature, and quality of the products Defendants are offering, constituting trademark infringement in violation of 15 U.S.C. § 1114.

93. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been, is now, and will be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Plaintiff will suffer further harm to its name, reputation, and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

94. Plaintiff further asserts a right to recovery of all Plaintiff's damages incurred as a result of Defendant's conduct and infringement, Defendants' profits received in connection with the infringement, the costs of this litigation, and attorney fees pursuant to 15 U.S.C. § 1117(a).

## THIRD CAUSE OF ACTION

### Violation of Lanham Act § 43, 15 U.S.C. § 1125(a)

95. The acts of Defendants described above constitute trademark infringement in violation Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).

96. In addition to its federal trademark registrations, Plaintiff owns and enjoys valid,

enforceable, and fully subsisting common law trademark rights in the Acton Trademark Terms and Acton Registered Trademarks in Texas and throughout the United States.

97. Defendants—(1) use of the Acton Trademark Terms and Acton Registered Trademarks in commerce in connection with the promotion and sale of educational services, and (2) false or misleading description or representation of facts surrounding the Apogee educational services in providing and promoting the Apogee educational services, in particular the false and misleading representations leading consumers to believe Apogee was developed in connection with the Acton Academy model or by the same people the developed and established the Acton Academy model—has caused, and is likely to continue to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Defendants with Acton Academy, or as to the origin sponsorship, or approval of Defendant's goods, services, or commercial activities by Acton Academy.

98. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been, is now, and will be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Plaintiff will suffer further harm to its name, reputation, and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

99. Plaintiff further asserts a right to recovery of all Plaintiff's damages incurred as a result of Defendant's conduct and infringement, Defendants' profits received in connection with the infringement, the costs of this litigation, and attorney fees pursuant to 15 U.S.C. § 1117(a).

## FOURTH CAUSE OF ACTION

### Violation of Lanham Act § 43, 15 U.S.C. § 1125(c)

100. The acts of Defendants described above constitute trademark infringement in violation Section 43 of the Lanham Act, 15 U.S.C. § 1125(c).

101. In addition to its federal trademark registrations, Plaintiff owns and enjoys valid, enforceable, and fully subsisting common law trademark rights in the Acton Trademark Terms and Acton Registered Trademarks in Texas and throughout the United States.

102. As detailed in this pleading, the Acton Trademark Terms and Acton Registered Trademarks are famous marks as defined by 15 U.S.C. § 1125(c)—i.e. widely recognized by the general consuming public of the United States as a designation of source of the goods or services by the mark's owner.

103. Defendants' use of these marks in commerce—via promoting and selling educational services—has caused and is likely to continue to cause dilution by blurring (an association that impairs the distinctiveness of the Acton Academy marks) and dilution by tarnishment (an association that harms the reputation of the Acton Academy marks) as defined by 15 U.S.C. § 1125(c). This specifically includes Defendants' use of Plaintiff's marks on their online websites and promotional materials.

104. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been, is now, and will be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Plaintiff will suffer further harm to its name, reputation, and goodwill. This harm constitutes an injury for which Plaintiff has no adequate remedy at law.

105. Plaintiff further asserts that, on information and belief, Defendants' infringements under 15 U.S.C. 1125(c) as detailed herein were done willfully and intentionally, and as such, Plaintiff seeks a right to recovery of all Plaintiff's damages incurred as a result of Defendant's conduct and infringement, Defendants' profits received in connection with the infringement, the costs of this litigation, and attorney fees pursuant to 15 U.S.C. § 1117(a).

## FIFTH CAUSE OF ACTION

### Common Law Trademark Infringement

106. Plaintiff owns and enjoys valid, enforceable, and fully subsisting common law trademark rights in the Acton Trademark Terms and Acton Registered Trademarks in Texas and throughout the United States.

107. Defendants, through the conduct and violations described above, have engaged in, engage in, and propose to engage in trademark infringement under Texas common law. As a consequence of Defendant's violations, Plaintiff is entitled to relief as set forth below.

## SIXTH CAUSE OF ACTION

### Violation of The Defend Trade Secrets Act, 18 U.S.C. §§ 1836, 1839

108. The acts of Defendants described above constitute trade secret misappropriation in violation the Defend Trade Secrets Act, 15 U.S.C. § 1125(c).

109. The Acton Materials are owned by Acton and constitute trade secrets as that term is defined in 18 U.S.C. § 1839(3), which include:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorializes physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). Among other things, Plaintiff has taken reasonable steps to keep the Acton Materials secret by requiring all Acton affiliates to enter into the *Trademark License Agreement* and the *Access and License Agreement*. In addition, Acton Academy derives economic value from the information not being generally known via the growth and financial value of the Acton Academy network, including financial remuneration received from Acton Academy affiliates via

licensing and revenue sharing fees.

110. As detailed in this pleading, Defendants acquired and used the Acton Materials through improper means and/or disclosed and used the Acton Materials without express or implied consent of Acton Academy, and at the time of such disclosure or use, knew or should have known that the Acton Materials were either (a) derived from a person who had used improper means to acquire knowledge of the Acton Materials; (b) acquired under circumstances giving rise to a duty to maintain the secrecy of the Acton Materials or limit the use of the Acton Materials; or (c) derived from or through a person who owed a duty to Acton Academy to maintain the secrecy of the Acton Materials or limit the use of the Acton Materials. Accordingly, Defendants have misappropriated Acton Academy's trade secrets as that term is defined in 18 U.S.C. § 1839(5).

111. On information and belief, Plaintiff asserts that Defendants have been and currently continue to use the Acton Materials without their authorization or consent, in competition with Acton Academy across the nation, and to Acton Academy's detriment.

112. Accordingly, Acton Academy brings this action seeking (1) an order requiring Defendants to immediately cease use of and certify destruction and/or return of all Acton Materials, and enjoining Defendants from any future use of the Acton Materials; and (2) damages for actual loss caused by the misappropriation of the Acton Materials and damages for any unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss. 18 U.S.C. § 1836(1), (3).

113. On information and belief, Plaintiff further alleges that the Acton Materials were willfully and maliciously misappropriated and seeks an award of exemplary damages and its reasonable attorney's fees. 18 U.S.C. § 1836(3)(C)-(D).

## SEVENTH CAUSE OF ACTION

### Unfair Competition Under Texas Common Law

114. The Texas tort of "unfair competition by misappropriation" entails three elements: "(i) the creation of plaintiff's product through extensive time, labor, skill and money, (ii) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff, and (iii) commercial damage to the plaintiff." *Synercom Tech., Inc. v. Univ. Computing Co.*, 474 F. Supp. 37, 39 (N.D. Tex. 1979).

115. As detailed in this pleading (1) Acton Academy began over a decade ago, and the development of the unique Acton Academy education system and its associated confidential and proprietary materials was created through Plaintiff's extensive time, labor, skill and money over that period; (2) Defendants are now using the Acton Materials and content in competition with Acton Academy, thereby gaining a special advantage in that competition because Defendants are burdened with little or none of the expense incurred by Acton Academy, and furthermore have largely not been burdened with the payment of any associated licensing fees; and (3) as a result, Acton Academy has been commercially damaged as set forth in this pleading, including as the result of the loss of Acton Academy campuses to Apogee—prior and future Acton Academies—and associated loss of fee and revenue payments, loss of students to competing Apogee schools and associated loss of tuition revenue from said students, loss and damage to Acton Academy goodwill, and the conversion and use of the Acton Academy Materials, content, and goodwill without compensation and the resulting unjust enrichment of Defendants.

116. As such, Plaintiff now seeks recovery of all damages incurred as result of Defendants wrongful unfair competition actions detailed herein.

## REQUEST FOR INJUNCTIVE RELIEF

117. Acton Academy asks the Court to set its request for permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction requiring Defendants, and all persons in active concert or participation with Defendants, to

(a) certify in writing the destruction or return of all the Acton Materials,

(b) cease use of all the Acton Materials,

(c) remove and/or delete all uses of the Acton Registered Trademarks and the Acton Trademark Terms from any of Defendant's website(s), marketing, promotion, curriculum, communications, or other content,

(d) cease all use of the Acton Registered Trademarks and the Acton Trademark Terms,

(e) cease utilizing answers, terms, or phrases in Apogee online FAQs that have previously been authored or created by Acton,

(f) cease utilizing language for Apogee job postings that have previously been authored by or created by Acton,

(g) cease misrepresenting that Matt Beaudreau was a "key person" in the creation and development of Acton Academy and the Acton Network,

(h) cease representing to parents and children that any of the Apogee Entities or their affiliates have opened or are operating a school "Just like Acton" by using any Acton Academy terms, phrases, concepts, or content.

118. Furthermore, Acton Academy requests that the Court order Defendants to produce all of Defendants' curriculum and material that any of the Defendants are utilizing and/or otherwise providing to Apogee affiliates in order to permit Acton Academy's review of Defendants' compliance with (or violation of) Acton Academy's trademarks, copyrights, and agreements.

## IX. JURY DEMAND

119. Plaintiff hereby demands a trial by jury for all issues triable by a jury.

## X. CONDITIONS PRECEDENT

120. Plaintiff would show that all conditions precedent have been performed or waived.

## XI. ATTORNEY'S FEES AND COSTS

121. Plaintiff seeks to recover all of its court costs, expenses, and reasonable and necessary attorneys' fees incurred in prosecuting this cause under any applicable law or rule allowing for such recovery. Specifically, Plaintiff seeks recovery of its reasonable and necessary attorneys' fees pursuant to Chapter 38 of the Texas Civil Practices and Remedies Code, pursuant to 18 U.S.C. § 1836(3)(C)-(D), and pursuant to 15 U.S.C. § 1117(a).

## XII. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays Defendants be cited to appear and answer herein, and the upon a final trial of this case, Plaintiff be awarded injunctive relief against Defendants ordering them to do the following:

(a) certify in writing the destruction or return of all the Acton Materials,

(b) cease use of all the Acton Materials,

(c) remove and/or delete all uses of the Acton Registered Trademarks and the Acton Trademark Terms from any of Defendant's website(s), marketing, promotion, curriculum, communications, or other content,

(d) cease all use of the Acton Registered Trademarks and the Acton Trademark Terms,

(e) cease utilizing answers, terms, or phrases in Apogee online FAQs that have previously been authored or created by Acton,

(f) cease utilizing language for Apogee job postings that have previously been authored by or created by Acton,

(g) cease misrepresenting that Matt Beaudreau was a "key person" in the creation and development of Acton Academy and the Acton Network,

(h) cease representing to parents and children that any of the Apogee Entities or their affiliates have opened or are operating a school "Just like Acton" by using any Acton Academy terms, phrases, concepts, or content.

Furthermore, Acton Academy requests that the Court order Defendants to produce all of Defendants' curriculum and material that any of the Defendants are utilizing and/or otherwise providing to Apogee affiliates in order to permit Acton Academy's review of Defendants' compliance with (or violation of) Acton Academy's trademarks, copyrights, and agreements.

Finally, Plaintiff further prays that it be awarded judgment against Defendants, jointly and/or severally, for the following:

i. Actual damages;

ii. Defendant's profits earned as result of trademark infringement;

iii. Unjust enrichment;

iv. Prejudgment and post-judgment interest

v. Judgment for Plaintiff's reasonable and necessary attorney fees;

vi. Exemplary damages;

vii. All costs of court and other and further relief, general and special, legal and equitable, to which Plaintiff is justly entitled.

Respectfully submitted,

SNELL LAW

BY: *<u>/s/ Jason W. Snell</u>*
Jason W. Snell
Bar No. 24013540
Matthew L. Kirby
Bar. No. 24099864

404 W. 13th Street
Austin, Texas 78701
(512) 477-5291 – Telephone
(512) 477-5294 – Facsimile
firm@snellfirm.com – Email

ATTORNEYS FOR PLAINTIFF

Civil Action No. 24-1456

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **ACTON ACADEMY, A NONPROFIT CORPORATION,** *Plaintiff* <br><br> **v.** <br><br> **TIM KENNEDY, APOGEE DENTON, LLC, APOGEE TX HIGH PLAINS, LLC, DOUG MORELAND AND SUZANE MORELAND D/B/A APOGEE FORT DAVIS, APOGEE FARMERSVILLE 719 EDUCATION CENTER, LLC, CAMERON PENN AND LAUREN PENN D/B/A APOGEE NORTH TEXAS, APOGEE LOCKHART LIFE LEARNING CENTER, LLC, APOGEE STRONG SAN ANTONIO, LLC, APOGEE KELLER, LLC, FATTIG BUSINESS DEVELOPMENT SERVICES, LLC D/B/A APOGEE LEAGUE CITY EAST, APOGEE NEW JERSEY, LLC, APOGEE BY THE SEA NJ, LLC, APOGEE BUCKEYE LAKE, LLC, TEACHING TO THE HEART, LLC D/B/A APOGEE CINCINNATI, APOGEE GAHANNA, LLC, KINGSBRIDGE ACADEMY D/B/A APOGEE DAYTON, JASON HERRICK D/B/A APOGEE HOCO, APOGEE CHARLOTTE COUNTY, LLC, APOGEE STRONG ORLANDO, LLC, EDUCATIONAL FREEDOM, LLC, D/B/A APOGEE ODESSA, APOGEE 926, LLC, APOGEE STRONG ANSON, LLC, APOGEE TAHOE, LLC, APOGEE SAN DIEGO, LLC, APOGEE SUMMIT COLORADO, LLC, AND APOGEE STRONG COLORADO HOLDINGS D/B/A APOGEE STRONG DENVER** *Defendants* | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 24-1456 |

**DECLARATION OF LAURA SANDEFER**

My name is Laura Sandefer. My date of birth is February 12, 1964, and my business address is 572 Diamond X Ranch Road, Johnson City, Texas 78636. I declare under penalty of

perjury that the following is true and correct:

1. I am the President of Acton Academy, which is the Plaintiff in the above-captioned cause (sometimes hereinafter referred to as "Acton"), and I have personal knowledge of the matters set forth hereinbelow.

2. I hereby verify that the allegations contained in Plaintiff's Original Complaint and Jury Demand, as well as the statements contained in this Declaration, are true and correct.

3. I am a custodian of records for Acton, and I am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities. Attached are the following records of Acton:

| | |
|---|---|
| Exhibit A-1 | *Trademark License Agreement* |
| Exhibit A-2 | *Access and License Agreement* |
| Exhibit A-3 | June 24, 2024 letter from Acton Academy's legal counsel to Apogee Strong Foundation, Matt Beaudreau and Tim Kennedy |
| Exhibit A-4 | June 25, 2024 letter from Acton Academy's legal counsel to Apogee Cedar Park, Matt Beaudreau and Tim Kennedy |
| Exhibit A-5 | Email communications between Acton Academy's legal counsel and Matt Beaudreau |

These are the original records or exact duplicates of original records. The records were made at or near the time of each act, event, condition, or opinion set forth, and it is the regular practice of Acton to make this type of record at or near the time of each act, event, condition, or opinion set forth in the record. The records were made by, or from information transmitted by, persons with knowledge of the matters set forth, and it is the regular practice of Acton for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them. The records were kept in the course of regularly conducted business activity, and it is the regular practice of Acton to keep this type of record in the course of regularly conducted business activity.

4. Acton Academy is a 501(c)(3) entity, and is a transformative K12 "learner-driven" educational movement and organization that Jeff Sandefer and Laura Sandefer founded in 2009 in Austin, Texas. Acton Academy is designed to "turn learning upside down." Acton's mission is to "inspire each person who enters our doors to find a calling that "will change the world" with the belief that "children are capable of far more than most adults can imagine." Acton is based on a simple but powerful set of beliefs:

- We believe each child has a gift that can change the world in a profound way.
- We believe in learning to know, learning to do, and learning to be.
- We believe in a closely connected family of lifelong learners.
- We believe in economic, religious, and political freedom.

The central focus of Acton Academy is a "Hero's Journey" for each "learner" or "hero," delivered during eleven months in seven six-week sprints powered by an overarching narrative featuring hands-on "quests" with a public exhibition at the end, followed by a one week break. Annual tuition at an Acton Academy averages $8,000 (as compared to the average educational spending of over $12,000 per child in the United States).

5. After Acton's founding in 2009, as word of its success spread, parents around the world began to hear of the approach and wanted to open their own Actons. In 2012, an Acton opened in Guatemala City, Guatemala, based on the interest and enthusiasm of one of Jeff Sandefer's former students at the Acton School of Business. A third affiliate opened in southern California that same year when an Austin Acton family moved to Venice Beach and wanted to start a school. In 2014, the Sandefers decided to grow their network of affiliates and hired Matt Clayton to focus on developing systems and structures that would be needed to roll out the concept more widely. Another 130 schools opened or prepared to launch over the next few years. By 2019, has Acton had received thousands of initial applications from people all over the world who wanted to start an Acton Academy School. By 2020, the Acton network included 227 schools: 97 existing schools and 130 slated to open in the fall of 2020 or 2021. The network reached 3,508 students in 2020 (an 83% growth over the prior year). Acton is now planning for 1,000 campuses serving 130,000 learners.

6. Acton Academy's learning design includes over 20,000 pages of interwoven proprietary materials, including unique and original examples, framework, processes, recipes, systems schedules, maps, contracts, audition funnels, challenges and launches for learners, parents, guides, and owners. Acton Academy's materials and content are legally protected and secured by various materials, including, but not limited to, its *Trademark License Agreement* and *Access and License Agreement*, true and correct copies of which are attached hereto as Exhibits A-1 and A-2, respectively. These materials must be acknowledged and accepted for an affiliate or its employees to access Acton Academy's learning design and content.

7. In 2017, Matt Beaudreau launched an Acton Academy affiliate in Placer, California followed by two more campuses. In 2022, Acton Academy engaged and paid Beaudreau for several months to promote Acton on podcasts. (Acton sometimes paid Acton owners for certain work on a contract/per job basis). Beaudreau contributed little to nothing to Acton's learner design or the creation of the network.

8. Acton Academy Placer – the Acton campus that Beaudreau represented he owned and the name under which Beaudreau did business in Texas –signed and accepted the terms of Acton's *Access and License Agreement*. Beaudreau and Acton Academy also signed and entered Acton's *Trademark License Agreement*. Pursuant to and in reliance upon Acton Academy Placer's execution and agreement – including Beaudreau's acceptance and ratification of the *Access and License Agreement* and *Trademark License Agreement* by, through and under Acton Academy Placer, as well as directly and individually – Acton allowed and provided Acton Academy Placer and Beaudreau access to and use of Acton's materials and content. Beaudreau has expressed to Acton's legal counsel that he was (and

continues to be) fully aware that he had access to Acton's materials and content only by, through, and under the terms of Acton's *Access and License Agreement* and *Trademark License Agreement* which Beaudreau ratified and adopted when he accessed and utilized Acton's materials and content.

9. In 2020, Acton Academy approved Tim Kennedy to open an Acton Academy campus he called "Apogee". Kennedy and Apogee Cedar Park signed and accepted the terms of Acton's *Trademark License Agreement* effective November 9, 2020, and Kennedy signed and accepted the terms of Acton's *Access and License Agreement* 11/11/20. The *License and Access* Agreement specifically defines the "*Authorized Users*" who are subject to the *License and Access Agreement* terms to include the following:

   "*Authorized Users" means Customer's employees, teachers, instructors, administrators, consultants, contractors, students, and agents (i) who are authorized by Customer to access and use the Services under the rights granted to Customer pursuant to this Agreement and (ii) for whom access to the Services has been purchased hereunder.*

   The access to and legal right to use Acton's Customer Data, Documentation, Provider IP, and Provider Services, and Services – as set forth and as defined in the *Access and License Agreement* – are granted to the Customer and the Customer's Authorized Users subject to the terms and restrictions set forth in the *License and Access Agreement*.

10. Acton Placer – an Acton affiliate near Sacrament – terminated Beaudreau for cause in mid-2022, and after additional investigation, Acton terminated all of Beaudreau's relationships with Acton Academy and the Acton network. Also in 2022, Acton terminated Kennedy's Acton Academy license for non-compliance under the terms of the agreement. As a result of the terminations, Kennedy and Beaudreau – and their affiliates – were required to return or destroy all Acton Academy materials as per the Acton Academy *Welcome Letter, Trademark License Agreement* and *Access and License Agreement* that both Kennedy and Beaudreau had signed.

11. Acton Academy has learned that many of its uniquely interwoven words and phrases, and other structure and elements of the Acton learning design that Acton authored and created, and that are unusual, unique, proprietary, and not seen in combination in other programs are, upon information and belief, currently being used by entities organized and/or controlled by Beaudreau and Kennedy under the name of "Apogee", and their affiliated schools, in whole or in substantial part and without Acton's approval or consent.

12. By way of example, Acton Academy identified the following key Acton words, phrases, and learning design used by Apogee entity(ies):

   - *The Hero's Journey*- the key organizing concept for Acton's learning design. (Acton Academy is the only K12 school that uses this as its organizing principle)
   - "*Learner-driven*" as a term to describe the educational approach and used rarely if at all by other schools.

- Labeling students as "*Hero's*" or "*Learners*." Acton is the only school that on information and belief uses these terms
- "*Equip*" learners to "*develop their God given talents and gifts*" is lifted almost verbatim from Acton's content.
- Language referring to children as "*geniuses*" who will "*find a calling*" and "*change the world*" is lifted almost verbatim from Acton's mission statement and promises.
- "*Guides*" as a word for "teacher." Referring to a teacher as a "*guide*" or "*Socratic guide*" are terms used by Acton.
- Small mixed age classrooms called "*studios*" which is a term used by Acton.
- "*A badge system*" to "*track progress*" and a promise of "no grades" lifted directly from Acton.
- "*Servant Leadership*" is a term to describe learners in one studio serving another.
- An 11 month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "quests" to develop real world skills – all Acton concepts and procedures.
- Apogee's daily schedules seem to be appropriated directly from Acton, including 2 – 3 "*Socratic launches*" in a day, *D.E.A.R* ("*Drop everything and read time*" and "*Core Skills*" in the morning and "*Quests*" in the afternoon. Acton created these combinations of activities and established several of the terms.
- "*We believe children are far more capable than you ever imagined*" – this is an original Acton phrase Apogee appropriated from Acton's website. Acton has documented at least ten examples of Apogee using this unique phrase in Apogee's promotional materials.
- *Peace corner* – a term used in Acton studios.
- A promise of "no homework" - unusual for a school to promise no homework, and a key Acton promise.
- Apogee FAQ text often is appropriated verbatim from Acton website. For example, an Apogee answer to a question about Montessori methods is copied directly from Acton's website.
- Apogee language for job postings is appropriated directly from Acton's job postings.
- "*We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know*" – this is copied word for word from Acton's beliefs.
- Apogee's *Children's Business Fair* – this is a direct appropriation from Acton's *Children's Business Fair*.
- Apogee: "*Our mission is to inspire each person who enters our doors to find a calling and change the world*" – this is copied verbatim from Acton's mission statement:

13. Additionally, Acton Academy learned of a "In a Life on Target" podcast episode titled "School--a Religion You Should Quit with Matt Beaudreau," in which Beaudreau identified himself as "the founder of Acton Academy Placer and Acton Academy" (which has more than 300 locations across the United States). More specifically, Acton Academy learned that on Ep. 53 | School—A Religion You Should Quit with Matt Beaudreau (Nov 4, 2022); Life On Target podcast (https://podtail.com), Beaudreau made the following statements and implications:

- *"(U)ltimately I had to do something different not just because I saw that it was the right thing but at that time I had children of my own and knowing what I know there was no way I was going to send them into what I now semi affectionately call the conveyor belt school model so I started building campuses of my own and I started inviting other families to come along and I was extraordinarily grateful to see that other families saw the same need one campus turned into three and in the process I was able to help almost 200 other entrepreneurs bring campuses to their family that's kind of put us to where we are now even helping these other entrepreneurs it was underneath somebody else's umbrella where there were just some small details where we went gosh I can see ways to make it better*." (at 00:59:46)
- Beaudreau failed to correct or clarify the host's comment of, "I know you have hundreds of locations globally". When the host asked about the challenges of going from zero to one campus versus building hundreds, Beaudreau confirmed the hardest is going from zero to one but failed to disclose that he only "owned" three campuses, not hundreds. (at approximately 17:45-21:30).
- The host asked Beaudreau how he went from a couple of campuses in a close geographic area to a global network. Again, Beaudreau did not clarify his role in the Acton network, instead answering so as to credit himself for expanding Acton's network. (at 24:05-27:01)
- Beaudreau gave his explanation of his understanding of exhibitions, the business fair, and "real-world work" within Acton Academy. These descriptions track Apogee advertisements, and documents that Apogee is using the same terms for the same concepts that Acton utilized and authored originally. (at 36:55-38:00)

14. Upon discovery of this information, Acton Academy instructed its legal counsel to reach out to Beaudreau and Kennedy in an effort to remedy the situation. A true and correct copy of the June 24, 2024 and June 25, 2024 letters which Acton Academy's legal counsel dispatched on behalf of Acton are attached hereto as Exhibits A-3 and A-4. A true and correct copy of the subsequent electronic correspondence between Matt Beaudreau and Acton Academy's legal counsel is attached hereto as Exhibit A-5.

15. To date, Acton Academy has not received confirmation from Beaudreau or Kennedy, or any of their affiliates, including any of the Apogee entities, that the above-referenced examples of use of Acton Academy's propriety information have been fully cured.

16. Acton Academy believes that it will suffer irreparable harm, damage, and injury unless the acts and conduct of Beaudreau and Kennedy, and their affiliates, including the Apogee entities, are enjoined because these parties' use of the Acton marks and Content is likely to cause confusion among customers and vendors which will result in a loss of customers, reputation, revenue, and profits, diminished marketing and advertising, and trademark dilution. Acton Academy believes that it is essential that the actions of Beaudreau and Kennedy, and their affiliates, including the Apogee entities, be restrained. Acton Academy believes that if Beaudrau and Kennedy, and their affiliates, including the Apogee entities, are allowed to use the Acton marks or Content or other marks confusingly similar to Acton marks and Content, Acton will suffer a financial loss to its business which may not be regained.

Executed in Travis County, State of Texas, on the 22nd day of November, 2024.

Laura Sandefer, President
Acton Academy, A Nonprofit Corporation

Civil Action No. 24-1456

# Exhibit A-1

# TRADEMARK LICENSE AGREEMENT

**THIS NON-EXCLUSIVE TRADEMARK LICENSE AGREEMENT** (hereinafter "***Agreement***") made effective Nov 09 2020 (the "***Effective Date***") is by and between **ACTON ACADEMY**, a Texas non-profit corporation ("***Licensor***") and Tim Kennedy, a Apogee Cedar Park ("***Licensee***"). Licensor and Licensee are hereinafter sometimes individually referred to as a "***Party***" or collectively as "***Parties***".

Licensor is the owner of all rights, title and interest in and to the name and trademark "ACTON ACADEMY" and all goodwill associated therewith (the "***Name***");

Licensee desires to use the Name in connection with educational services to be provided at one Acton Academy affiliate in Cedar Park/Leander (the "***Academy***"), and Licensor desires to grant such a license to Licensee, pursuant to the terms and conditions of this Agreement.

In consideration of the mutual promises herein contained and for other good and valuable consideration the receipt of which is hereby acknowledged, it is hereby agreed as follows:

1. **Grant of License**.

a. License. Upon the terms and conditions of this Agreement, Licensor hereby grants to Licensee a royalty-free non-exclusive license to use the Name in connection with the Academy (the "***License***").

b. Sublicensing. Licensee shall not have the right to grant sublicenses.

c. Term. This Agreement shall be effective as of the Effective Date, and shall remain in full force and effect for five (5) years thereafter (the "***Initial Term***"), and unless sooner terminated under the provisions hereof, shall be automatically renewed for successive one (1) year terms (each a "***Renewal Term***") unless either Party notifies the other in writing at least sixty (60) days prior to the end of the then current Initial Term or Renewal Term, of its intention not to renew the Agreement, or unless sooner terminated in accordance with Section 6 (the Initial Term and any Renewal Term hereinafter collectively referred to as the "***Term***").

2. **Goodwill**.

Licensee recognizes the great value of the goodwill associated with the Name and acknowledges that the Name and the goodwill pertaining thereto belong exclusively to Licensor. Licensee shall not during the Term of this Agreement, or thereafter, attack the title or any right or interest of Licensor in and to the Name or attack the validity of this License.

3. **Quality of Services**.

The offering or sale or rendering of educational services in connection with the Academy by Licensee shall be provided in accordance with the written "Guidelines for

use of the ACTON ACADEMY trademark" provided to Licensee in Licensor's initial offer letter, as well as other written guidelines designated by Licensor from time to time and with all applicable federal, state and local laws, and the same shall not reflect adversely upon the good name of Licensor or the Name. All services provided by Licensee in connection with the Academy will be of high quality, standard and/or skill. Upon request by Licensor, Licensee shall furnish to Licensor free of cost, for its written approval, examples of printed items referencing the Name used and to be used by Licensee in connection with the Academy.

4. **Inspection**.

Licensor shall have the right to inspect all facilities, including the Academy, to ensure compliance with Licensor's quality control requirements.

5. **Use of Name by Licensee**.

a. Licensee shall select its name for business operations according to one of the two following options, subject to approval by Licensor:

(i) "Acton Academy [city]" (larger cities may prefer a neighborhood or suburb name); or

(ii) Any name without the word "Acton", in which case Licensee may choose to identify itself as "[unique name]: An Acton Academy".

Licensee's choice of name: Apogee an Acton Academy

b. Licensee shall only use the Name as the name of the Academy and, incidental to the use as the name of the Academy, to identify any of the educational and related services offered at the Academy. No other uses are permitted.

c. With the exception of the registration of the Name as a Domain Name as provided for in Section 5(d)(i), Licensee shall at no time attempt to register or register anywhere in its own name, or on behalf of any other person, the Name, or any mark incorporating the Name, and also shall not associate the Name with any article or service, other than those educational and related services offered in connection with the Academy.

d. Registration of Domain Names. As a licensee of the Name, Licensee is permitted to use the Name in connection with a single domain name to identify the Academy on the internet in accordance with the terms and conditions of this Section (the "***Domain Name***"), and otherwise in accordance with this Agreement.

(i) Licensee shall choose one domain name, consistent with name chosen in 5(a).

Licensee's choice of domain name: Apogee cedarpark.com

(ii) If granted written approval in this agreement (which shall not be reasonably withheld), the Domain Name (approved pursuant to the procedure of Section 5(d)(i)) may be registered in the name of the Licensee, with the Licensor owning all rights, title and interest in and to the Domain Name.

(iii) Thereafter, Licensee shall maintain sole responsibility for the Domain Name including, associating a website with such Domain Name (if desired), keeping track of deadlines associated with maintaining the Domain Name registration, and paying all required renewal fees for the continued registration of the Domain Name (if Licensee so desires to continue registration of the Domain Name). Notwithstanding the foregoing, as owner of the Domain Name, Licensor reserves the right, in its sole and absolute discretion, to request that the Licensee disable a website or other content associated with the Domain Name and/or cancel the Domain Name registration in the event of a breach of this Agreement.

e. Licensee shall not use the Name in combination with any other trademark or service mark of a third party without the express written consent of Licensor.

f. Licensee shall cooperate fully and in good faith with Licensor for the purpose of securing and preserving Licensor's rights in and to the Name.

g. Licensee's use of the Name in accordance with this Agreement shall inure to the benefit of Licensor. Licensee shall not at any time acquire any rights in such Name by virtue of any use it may make of such Name, including any such use in accordance with this Agreement.

**6. <u>Termination</u>.**

a. <u>Events of Termination</u>. This Agreement may be terminated as follows:

<u>Default</u>. If either Party shall be in default of any obligation hereunder, the other Party may terminate this Agreement by giving thirty (30) days written notice to the other Party, specifying the basis for the termination. If within thirty (30) days after the receipt of such notice, the Party who received notice has remedied the condition forming the basis for termination, such notice shall cease to be operative, and this Agreement shall continue in full force. If the condition forming the basis of termination is not cured by the expiration of the thirty (30) day period, the Party that provided notice of the default may terminate this Agreement by providing written notice of termination to the other Party. Such termination is effective upon the Party's receipt of the written notice of termination.

By either Party upon 60 days written notice. If either Party desires to terminate the Agreement, the Party desiring termination shall provide the other Party at least sixty (60) days prior written notice of its intent to terminate, such termination is effective upon sixty (60) days following the other Party's receipt of the written notice of termination.

b. Termination defined. The expiration of this Agreement or any termination of this Agreement under the provisions of this Section shall be referenced as "***Termination***".

7. **Effect of Termination.**

a. Upon and after the Termination of the Agreement, all rights granted to Licensee hereunder shall forthwith revert to Licensor, and within six (6) months following the Termination of the Agreement, Licensee will cease, and forever refrain from, all use or employment of the Name or anything deemed by Licensor to be similar to the Name, whether alone or in combination with any other word, symbol, or design, in connection with, without limitation, any and all advertising and promotional materials, signage, letterhead, printed materials, brochures, emblems, domain name uses including the Domain Name and all content associated therewith, email advertising, email messages, phone solicitation and phone answering, telephone directories and listings, visible pages of any website or electronic bulletin board, metatags and search keywords.

b. At the Termination of this Agreement, Licensee shall be deemed to have assigned, transferred and conveyed to Licensor any right in and to the Name, and any associated goodwill, which may have been obtained by Licensee, or which may have vested in Licensee in pursuit of offering goods or services, or through use of the Name in accordance with this Agreement, and Licensee shall execute any instruments requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement.

8. **Assignment**.

Licensee shall not assign or transfer this Agreement, or any portion thereof, without the prior written consent of Licensor. Any assignment or transfer of this Agreement or any portion thereof without such written consent will void this Agreement.

9. **Notice**.

All notices, approvals or other communications required or permitted to be given by either Party to the other Party under this Agreement shall be in writing and shall be deemed to have been given if e-mailed as follows:

If to Licensor: Acton Academy
Attn: Laura Sandefer
E-mail: LSandefer@actonmail.org

If to Licensee: Tim Kennedy 9108501916

10. **Choice of Law, Jurisdiction and Venue**. This Agreement shall be deemed to have been made and shall be construed, interpreted and enforced pursuant to and in accordance with the laws of the State of Texas without regard to the conflicts of laws or principles thereof. Venue for any action arising under or in connection with this Agreement shall lie exclusively in Travis County, Texas.

The Parties hereto have duly executed this Agreement as of the dates set forth herein below.

| ACTON ACADEMY | Apogee Cedar Park |
|---|---|
| By: Laura Sandefer<br>Laura Sandefer, Director | By: [signature] |
| | Its: Owner |
| Date: Nov 09 2020 | Date: Nov 09 2020 |

**Mailing Address**

2201 Alexander Ave

Austin, TX 78722

USA

**Mailing Address**

Address: PO Box 204116

City: Austin

State/Region: Texas

Zip/Postal Code: 78720

Country: Usa

# TRADEMARK LICENSE AGREEMENT

**THIS NON-EXCLUSIVE TRADEMARK LICENSE AGREEMENT** (hereinafter "***Agreement***") made effective Mar 27 2021 (the "***Effective Date***") is by and between **ACTON ACADEMY**, a Texas non-profit corporation ("***Licensor***") and Matt Beaudreau, a Acton Academy ("***Licensee***"). Licensor and Licensee are hereinafter sometimes individually referred to as a "***Party***" or collectively as "***Parties***".

Licensor is the owner of all rights, title and interest in and to the name and trademark "ACTON ACADEMY" and all goodwill associated therewith (the "***Name***");

Licensee desires to use the Name in connection with educational services to be provided at one Acton Academy affiliate in Acton Academy Place (the "***Academy***"), and Licensor desires to grant such a license to Licensee, pursuant to the terms and conditions of this Agreement.

In consideration of the mutual promises herein contained and for other good and valuable consideration the receipt of which is hereby acknowledged, it is hereby agreed as follows:

1. **Grant of License**.

a. License. Upon the terms and conditions of this Agreement, Licensor hereby grants to Licensee a royalty-free non-exclusive license to use the Name in connection with the Academy (the "***License***").

b. Sublicensing. Licensee shall not have the right to grant sublicenses.

c. Term. This Agreement shall be effective as of the Effective Date, and shall remain in full force and effect for five (5) years thereafter (the "***Initial Term***"), and unless sooner terminated under the provisions hereof, shall be automatically renewed for successive one (1) year terms (each a "***Renewal Term***") unless either Party notifies the other in writing at least sixty (60) days prior to the end of the then current Initial Term or Renewal Term, of its intention not to renew the Agreement, or unless sooner terminated in accordance with Section 6 (the Initial Term and any Renewal Term hereinafter collectively referred to as the "***Term***").

2. **Goodwill**.

Licensee recognizes the great value of the goodwill associated with the Name and acknowledges that the Name and the goodwill pertaining thereto belong exclusively to Licensor. Licensee shall not during the Term of this Agreement, or thereafter, attack the title or any right or interest of Licensor in and to the Name or attack the validity of this License.

3. **Quality of Services**.

The offering or sale or rendering of educational services in connection with the Academy by Licensee shall be provided in accordance with the written "Guidelines for

use of the ACTON ACADEMY trademark" provided to Licensee in Licensor's initial offer letter, as well as other written guidelines designated by Licensor from time to time and with all applicable federal, state and local laws, and the same shall not reflect adversely upon the good name of Licensor or the Name. All services provided by Licensee in connection with the Academy will be of high quality, standard and/or skill. Upon request by Licensor, Licensee shall furnish to Licensor free of cost, for its written approval, examples of printed items referencing the Name used and to be used by Licensee in connection with the Academy.

4. **Inspection**.

Licensor shall have the right to inspect all facilities, including the Academy, to ensure compliance with Licensor's quality control requirements.

5. **Use of Name by Licensee**.

a. Licensee shall select its name for business operations according to one of the two following options, subject to approval by Licensor:

(i) "Acton Academy [city]" (larger cities may prefer a neighborhood or suburb name); or

(ii) Any name without the word "Acton", in which case Licensee may choose to identify itself as "[unique name]: An Acton Academy".

Licensee's choice of name: Acton Academy Placer

b. Licensee shall only use the Name as the name of the Academy and, incidental to the use as the name of the Academy, to identify any of the educational and related services offered at the Academy. No other uses are permitted.

c. With the exception of the registration of the Name as a Domain Name as provided for in Section 5(d)(i), Licensee shall at no time attempt to register or register anywhere in its own name, or on behalf of any other person, the Name, or any mark incorporating the Name, and also shall not associate the Name with any article or service, other than those educational and related services offered in connection with the Academy.

d. Registration of Domain Names. As a licensee of the Name, Licensee is permitted to use the Name in connection with a single domain name to identify the Academy on the internet in accordance with the terms and conditions of this Section (the "***Domain Name***"), and otherwise in accordance with this Agreement.

(i) Licensee shall choose one domain name, consistent with name chosen in 5(a).

Licensee's choice of domain name: www.actonplacer.com

(ii) If granted written approval in this agreement (which shall not be reasonably withheld), the Domain Name (approved pursuant to the procedure of Section 5(d)(i)) may be registered in the name of the Licensee, with the Licensor owning all rights, title and interest in and to the Domain Name.

(iii) Thereafter, Licensee shall maintain sole responsibility for the Domain Name including, associating a website with such Domain Name (if desired), keeping track of deadlines associated with maintaining the Domain Name registration, and paying all required renewal fees for the continued registration of the Domain Name (if Licensee so desires to continue registration of the Domain Name). Notwithstanding the foregoing, as owner of the Domain Name, Licensor reserves the right, in its sole and absolute discretion, to request that the Licensee disable a website or other content associated with the Domain Name and/or cancel the Domain Name registration in the event of a breach of this Agreement.

e. Licensee shall not use the Name in combination with any other trademark or service mark of a third party without the express written consent of Licensor.

f. Licensee shall cooperate fully and in good faith with Licensor for the purpose of securing and preserving Licensor's rights in and to the Name.

g. Licensee's use of the Name in accordance with this Agreement shall inure to the benefit of Licensor. Licensee shall not at any time acquire any rights in such Name by virtue of any use it may make of such Name, including any such use in accordance with this Agreement.

**6. <u>Termination</u>.**

a. <u>Events of Termination</u>. This Agreement may be terminated as follows:

<u>Default</u>. If either Party shall be in default of any obligation hereunder, the other Party may terminate this Agreement by giving thirty (30) days written notice to the other Party, specifying the basis for the termination. If within thirty (30) days after the receipt of such notice, the Party who received notice has remedied the condition forming the basis for termination, such notice shall cease to be operative, and this Agreement shall continue in full force. If the condition forming the basis of termination is not cured by the expiration of the thirty (30) day period, the Party that provided notice of the default may terminate this Agreement by providing written notice of termination to the other Party. Such termination is effective upon the Party's receipt of the written notice of termination.

By either Party upon 60 days written notice. If either Party desires to terminate the Agreement, the Party desiring termination shall provide the other Party at least sixty (60) days prior written notice of its intent to terminate, such termination is effective upon sixty (60) days following the other Party's receipt of the written notice of termination.

b. Termination defined. The expiration of this Agreement or any termination of this Agreement under the provisions of this Section shall be referenced as "***Termination***".

**7. Effect of Termination.**

a. Upon and after the Termination of the Agreement, all rights granted to Licensee hereunder shall forthwith revert to Licensor, and within six (6) months following the Termination of the Agreement, Licensee will cease, and forever refrain from, all use or employment of the Name or anything deemed by Licensor to be similar to the Name, whether alone or in combination with any other word, symbol, or design, in connection with, without limitation, any and all advertising and promotional materials, signage, letterhead, printed materials, brochures, emblems, domain name uses including the Domain Name and all content associated therewith, email advertising, email messages, phone solicitation and phone answering, telephone directories and listings, visible pages of any website or electronic bulletin board, metatags and search keywords.

b. At the Termination of this Agreement, Licensee shall be deemed to have assigned, transferred and conveyed to Licensor any right in and to the Name, and any associated goodwill, which may have been obtained by Licensee, or which may have vested in Licensee in pursuit of offering goods or services, or through use of the Name in accordance with this Agreement, and Licensee shall execute any instruments requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement.

**8. Assignment.**

Licensee shall not assign or transfer this Agreement, or any portion thereof, without the prior written consent of Licensor. Any assignment or transfer of this Agreement or any portion thereof without such written consent will void this Agreement.

**9. Notice.**

All notices, approvals or other communications required or permitted to be given by either Party to the other Party under this Agreement shall be in writing and shall be deemed to have been given if e-mailed as follows:

If to Licensor: Acton Academy
Attn: Laura Sandefer
E-mail: LSandefer@actonmail.org

If to Licensee: Acton Academy Placer
Attn: Matt Beaudreau
Email: Matt@actonplacer.com

**10.** **Choice of Law, Jurisdiction and Venue**. This Agreement shall be deemed to have been made and shall be construed, interpreted and enforced pursuant to and in accordance with the laws of the State of Texas without regard to the conflicts of laws or principles thereof. Venue for any action arising under or in connection with this Agreement shall lie exclusively in Travis County, Texas.

The Parties hereto have duly executed this Agreement as of the dates set forth herein below.

**ACTON ACADEMY**

By: Laura Sandefer
Laura Sandefer, Director

Date: Mar 29 2021

**Mailing Address**

2201 Alexander Ave

Austin, TX 78722

USA

Acton Academy Placer

By: Matthew Beaudreau

Its: President

Date: Mar 27 2021

**Mailing Address**

Address: 725 Vernon Street

City: Roseville

State/Region: CA

Zip/Postal Code: 95678

Country: USA

# Exhibit A-2

**Last Modified: September 17, 2019**

# Access and License Agreement

This Access and License Agreement (this "**Agreement**"), is by and between Acton Academy, a Texas non-profit corporation ("**Provider**") and you ("**Customer**," "**you**," or "**your**"). Provider and Customer may be referred to herein collectively as the "**Parties**" or individually as a "**Party**." This Agreement governs your access to and use of the Services, as hereinafter defined.

THIS AGREEMENT TAKES EFFECT WHEN YOU CLICK THE "I ACCEPT" BUTTON BELOW OR BY ACCESSING OR USING THE SERVICES (THE "**EFFECTIVE DATE**"). PROVIDER PROVIDES THE SERVICES SOLELY ON THE TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND ON THE CONDITION THAT YOU ACCEPT AND COMPLY WITH THEM. BY CLICKING THE "ACCEPT" BUTTON, YOU (A) ACCEPT THIS AGREEMENT AND AGREE THAT YOU ARE LEGALLY BOUND BY ITS TERMS; AND (B) REPRESENT AND WARRANT THAT: (I) YOU ARE 18 YEARS OF AGE OR OLDER/OF LEGAL AGE TO ENTER INTO A BINDING AGREEMENT; AND (II) IF YOU ARE ENTERING INTO THIS AGREEMENT FOR A CORPORATION, GOVERNMENTAL ORGANIZATION, OR OTHER LEGAL ENTITY, YOU HAVE THE RIGHT, POWER, AND AUTHORITY TO ENTER INTO THIS AGREEMENT ON BEHALF OF THE ORGANIZATION AND BIND THE ORGANIZATION TO ITS TERMS. IF YOU DO NOT AGREE TO THESE TERMS, PLEASE SELECT THE "I DECLINE" BUTTON BELOW. IF YOU DO NOT ACCEPT THESE TERMS, YOU MAY NOT ACCESS OR USE THE SERVICES.

1. Definitions.

(a) "**Authorized User**" means Customer's employees, teachers, instuctors, administrators, consultants, contractors, students, and agents (i) who are authorized by Customer to access and use the Services under the rights granted to Customer pursuant to this Agreement and (ii) for whom access to the Services has been purchased hereunder.

(b) "**Customer Data**" means information, data, and other content, in any form or medium, that is submitted, posted, collected, downloaded, or otherwise received, directly or indirectly from the Customer or an Authorized User by or through the Services, including, but not limited to, learning design content, curriculum, lesson plans, discussion outlines, assignments, lesson plans, course outlines, school and studio processes, user contributions and submissions, marketing materials, emails, templates, frameworks, notes, videos, case studies, User Contributions, and any and all Customer and Authorized User permitted modifications to Provider Content.

(c) "**Documentation**" means Provider's user manuals, handbooks, and guides relating to the Services provided by Provider to Customer either electronically or in hard copy form.

(d) **"Order Form"** means the ordering document between Customer and Provider setting the price and the length of time that the Services will be available to Customer and its Authorized Users.

(e) **"Provider IP"** means the Services, the Documentation, Provider Content, and any and all intellectual property provided to Customer or any Authorized User in connection with the foregoing or anything created as a result of this Agreement.

(f) **"Provider Content"** means learning content that Provider provides to its Customers through the Services, including, but not limited to, learning design content, curriculum, discussion outlines, assignments, lesson plans, course outlines, school and studio processes, user contributions and submissions (i.e., examples of past student work), marketing materials, emails, templates, frameworks, notes, videos, case studies, and handbooks created by Provider for Customer and Authorized User's use with the Services.

(g) **"Services"** means the services provided by Provider.

2. Access and Use.

(a) Provision of Access. Subject to the terms and conditions of this Agreement, Provider hereby grants Customer and its Authorized Users a non-exclusive, non-transferable (except in compliance with Section 12(g)) right to access and use the Services during the Term, solely for use by Customer and its Authorized Users in accordance with the terms and conditions herein. Such use is limited to Customer and its Authorized User's internal use. Provider shall provide to Customer the necessary passwords and network links or connections to allow Customer to access the Services and to facilitate access for the Authorized Users.

(b) License. Subject to the terms and conditions contained in this Agreement, Provider hereby grants to Customer and its Authorized Users a non-exclusive, non-sublicenseable, non-transferable (except in compliance with Section 12(g)) license to use the Provider Content and Documentation during the Term solely for Customer and its Authorized User's internal business purposes in connection with use of the Services.

(c) Use Restrictions. Customer shall not use and shall prohibit its Authorized Users and from using the Services for any purposes beyond the scope of the access granted in this Agreement. Customer shall not at any time, directly or indirectly, and shall not permit any Authorized Users to: (i) copy, modify, or create derivative works of the Services or Documentation, in whole or in part; (ii) rent, lease, lend, sell, license, sublicense, assign, distribute, publish, transfer, or otherwise make available the Services or Documentation; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part; (iv) remove any proprietary notices from the Services or Documentation; (v) use the Services or Documentation in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law (vi) transmit, or procure the

sending of, any advertising or promotional material, including any "junk mail", "chain letter" or "spam" or any other similar solicitation. Furthermore, in no event shall Customer or any Authorized User publicly display any Provider Content, on social media or otherwise, without the first providing at least three (3) days prior written notice (the "**Notice Period**") to Provider at info@actonacademy.org for approval thereof. Such public display shall be deemed approved unless Customer receives written notice of disapproval, at which point such display of Provider Content shall be immediately removed. Use of Provider Content shall be restricted for use only in connection with recruiting and advertising of Customer's services and further, such disclosure shall be limited only to discrete portions of Provider Content sufficient to aid such recruiting and advertising.

(d) Reservation of Rights. Provider reserves all rights not expressly granted to Customer in this Agreement. Except for the limited rights and licenses expressly granted under this Agreement, nothing in this Agreement grants, by implication, waiver, estoppel, or otherwise, to Customer or any third party any intellectual property rights or other right, title, or interest in or to the Provider IP.

(e) Suspension. Notwithstanding anything to the contrary in this Agreement, Provider may temporarily or permanently suspend Customer and any Authorized End User's access to any portion or all of the Services if: (i) Provider reasonably determines that (A) there is a threat or attack on any of the Provider IP; (B) Customer's or any Authorized End User's use of the Provider IP disrupts or poses a security risk to the Provider IP or to any other customer or vendor of Provider; (C) Customer, or any Authorized End User, is using the Provider IP for fraudulent or illegal activities; (D) subject to applicable law, Customer has ceased to continue its business in the ordinary course, made an assignment for the benefit of creditors or similar disposition of its assets, or become the subject of any bankruptcy, reorganization, liquidation, dissolution, or similar proceeding; or (E) Provider's provision of the Services to Customer or any Authorized End User is prohibited by applicable law; (ii) any vendor of Provider has suspended or terminated Provider's access to or use of any third-party services or products required to enable Customer and its Authorized Users to access the Services; or (iii) in accordance with Section 5 (any such suspension described in subclause (i), (ii), or (iii), a "**Service Suspension**"). Provider shall use commercially reasonable efforts to provide written notice of any Service Suspension to Customer and to provide updates regarding resumption of access to the Services following any Service Suspension. Provider shall use commercially reasonable efforts to resume providing access to the Services as soon as reasonably possible after the event giving rise to the Service Suspension is cured. Provider will have no liability for any damage, liabilities, losses (including any loss of data or profits), or any other consequences that Customer or any Authorized User may incur as a result of a Service Suspension.

3. Customer Responsibilities. Customer is responsible and liable for all uses of the Provider IP and Customer Data resulting from access provided by Customer, directly or indirectly, whether such access or use is permitted by or in violation of this Agreement. Without limiting the generality of the foregoing, Customer is responsible for all acts and omissions of all Authorized Users, and any act or omission by an Authorized User that would constitute a breach

of this Agreement if taken by Customer will be deemed a breach of this Agreement by Customer. Customer shall use reasonable efforts to make all Authorized Users aware of this Agreement's provisions as applicable to such Authorized User's use of the Services, and shall cause Authorized Users to comply with such provisions.

4. User Contributions. The Services may contain message boards, chat rooms, personal web pages or profiles, forums, bulletin boards and other interactive features that allow Customer and Authorized Users to post, submit, publish, display or transmit to other users or other persons content or materials (collectively, "**User Contributions**") on or through the Services. All User Contributions must comply with the terms and conditions as set forth in this Agreement.

(a) Any User Contribution posted to the site will be considered non-confidential and non-proprietary. By providing any User Contribution, Provider and its licensees, successors and assigns and each of Providers customers shall have the right to use, reproduce, modify, perform, display, distribute and otherwise disclose to Provider's other Customer's and other third parties any such material for any purpose.

(b) Customer represents and warrant that:

(i) Customer and its Authorized Users own or control all rights in and to the User Contributions and have the right to grant the license granted above to Provider and Provider's licensees, successors and assigns.

(ii) All User Contributions do and will comply with this Agreement.

(iii) Customer is responsible for any User Contributions submitted or contributed by Customer and it Authorized Users, including its legality, reliability, accuracy and appropriateness.

(c) Provider is not responsible, or liable to any third party, for the content or accuracy of any User Contributions posted by Customer or its Authorized Users. Furthermore, Provider cannot and does not undertake to review all material before it is posted, and cannot ensure prompt removal of objectionable material after it has been posted. Accordingly, Provider assumes no liability for any action or inaction regarding transmissions, communications or content provided by any user or third party.

(d) Provider has the unrestricted right to:

(i) Remove or refuse to post any User Contributions for any or no reason in its sole discretion.

(ii) Take any action with respect to any User Contribution that Provider deems necessary or appropriate in Provider's sole discretion, including if Provider believes that such User Contribution violates this Agreement, infringes any intellectual property right or other right of any person or entity, threatens the personal safety of users of the Services or the public or could create liability for Provider.

(iii) Disclose Customer's and its Authorized User's identity or other information to any third party who claims that material posted by Customer violates their rights, including their intellectual property rights or their right to privacy.

5. Taxes. All fees and other amounts payable by Customer under this Agreement are exclusive of taxes and similar assessments. Customer is responsible for all sales, use, and excise taxes, and any other similar taxes, duties, and charges of any kind imposed by any federal, state, or local governmental or regulatory authority on any amounts payable by Customer hereunder, other than any taxes imposed on Provider's income.

6. Confidential Information. From time to time during the Term, either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media/in written or electronic form or media, whether or not marked, designated or otherwise identified as "confidential" (collectively, "**Confidential Information**"). Confidential Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Party at the time of disclosure; (c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; or (d) independently developed by the receiving Party. The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees or authorized persons who have a need to know the Confidential Information for the receiving Party to exercise its rights or perform its obligations hereunder. Notwithstanding the foregoing, each Party may disclose Confidential Information to the limited extent required (i) in order to comply with the order of a court or other governmental body, or as otherwise necessary to comply with applicable law, provided that the Party making the disclosure pursuant to the order shall first have given written notice to the other Party and made a reasonable effort to obtain a protective order; or (ii) to establish a Party's rights under this Agreement, including to make required court filings. On the expiration or termination of the Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed. Each Party's obligations of non-disclosure with regard to Confidential Information are effective as of the Effective Date and will expire five years from the date first disclosed to the receiving Party; provided, however, with respect to any Confidential Information that constitutes a trade secret (as determined under applicable law), such obligations of non-disclosure will survive the termination or expiration of this Agreement for as long as such Confidential Information remains subject to trade secret protection under applicable law.

7. Intellectual Property Ownership. Customer acknowledges that, as between Customer and Provider, Provider owns all right, title, and interest, including all intellectual property rights, in and to the Provider IP and, with respect to Third-Party Products, the applicable third-party providers own all right, title, and interest, including all intellectual property rights, in and to the Third-Party Products.

8. Warranties.

(a) BY PROVIDER. THE SERVICES AND THE PROVIDER IP ARE PROVIDED "AS IS" AND PROVIDER HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE SERVICES, THE PROVIDER IP, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET CUSTOMER'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE.

(b) BY CUSTOMER. ANY INFORMATION OR WORK PRODUCT PROVIDED BY CUSTOMER OR ITS AUTHORIZED USERS, INCLUDING ANY CUSTOMER DATA, (I) WILL NOT INFRINGE, MISAPPROPRIATE, OR OTHERWISE VIOLATE ANY INTELLECTUAL PROPERTY RIGHTS OR OTHER RIGHTS OF ANY THIRD PARTY; (II) WILL COMPLY WITH ALL APPLICABLE LAWS; (III) WILL NOT CONTAIN ANY VIRUS, TROJAN HORSE, WORM, BACKDOOR MALWARE, OR OTHER SOFTWARE THE EFFECT OF WHICH IS TO PERMIT UNAUTHORIZED ACCESS OR TO DISABLE, ERASE, CORRUPT, OR OTHERWISE HARM ANY COMPUTER, SYSTEMS, OR SOFTWARE, OR ANY TIME BOMB, DROP DEAD DEVICE, OR OTHER SOFTWARE DESIGNED TO DISABLE A COMPUTER PROGRAM AUTOMATICALLY WITH THE PASSAGE OF TIME OR UNDER THE POSITIVE CONTROL OF ANY PERSON; (IV) CONTAIN ANY MATERIAL WHICH IS DEFAMATORY, OBSCENE, INDECENT, ABUSIVE, OFFESNIVE HARRASING, VIOLENT, HATEFUL, INFLAMMATORY OR OTHERWISE OBJECTIONABOLE.

9. Indemnification.

(a) Provider Indemnification.

(i) Provider shall indemnify, defend, and hold harmless Customer from and against any and all losses, damages, liabilities, costs (including reasonable attorneys' fees) ("**Losses**") incurred by Customer resulting from any third-party claim, suit, action, or proceeding ("**Third-Party Claim**") that the Services, or any use of the Services in accordance with this Agreement, infringes or misappropriates such third party's US intellectual property rights, provided that Customer promptly notifies Provider in writing of the claim, cooperates with Provider, and allows Provider sole authority to control the defense and settlement of such claim.

(ii) If such a claim is made or appears possible, Customer agrees to permit Provider, at Provider's sole discretion, to (A) modify or replace the Services, or component or part thereof, to make it non-infringing, or (B) obtain

the right for Customer to continue use. If Provider determines that neither alternative is reasonably available, Provider may terminate this Agreement, in its entirety or with respect to the affected component or part, effective immediately on written notice to Customer.

(iii) This Section 9(a) will not apply to the extent that the alleged infringement arises from: (A) use of the Services in combination with data, including Customer Data, software, hardware, equipment, or technology not provided by Provider or authorized by Provider in writing; (B) modifications to the Services not made by Provider.

(b) Customer Indemnification. Customer shall indemnify, hold harmless, and, at Provider's option, defend Provider from and against any Losses resulting from any Third-Party Claim that the Customer Data, or any use of the Customer Data in accordance with this Agreement, infringes or misappropriates such third party's intellectual property rights and any Third-Party Claims based on Customer's or any Authorized User's (i) negligence or willful misconduct; (ii) use of the Services in a manner not authorized by this Agreement, including posting infringing materials or any defamatory statements on chat boards or forums or the like; (iii) use of the Services in combination with data, software, hardware, equipment or technology not provided by Provider or authorized by Provider in writing; or (iv) modifications to the Services not made by Provider, provided that Customer may not settle any Third-Party Claim against Provider unless Provider consents to such settlement, and further provided that Provider will have the right, at its option, to defend itself against any such Third-Party Claim or to participate in the defense thereof by counsel of its own choice.

(c) Sole Remedy. THIS SECTION 9 SETS FORTH CUSTOMER'S SOLE REMEDIES AND PROVIDER'S SOLE LIABILITY AND OBLIGATION FOR ANY ACTUAL, THREATENED, OR ALLEGED CLAIMS THAT THE SERVICES INFRINGE, MISAPPROPRIATE, OR OTHERWISE VIOLATE ANY INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY.

10. Limitations of Liability. IN NO EVENT WILL PROVIDER BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY: (a) CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES; (b) INCREASED COSTS, DIMINUTION IN VALUE OR LOST BUSINESS, PRODUCTION, REVENUES, OR PROFITS; (c) LOSS OF GOODWILL OR REPUTATION; (d) USE, INABILITY TO USE, LOSS, INTERRUPTION, DELAY OR RECOVERY OF ANY DATA, OR BREACH OF DATA OR SYSTEM SECURITY; OR (e) COST OF REPLACEMENT GOODS OR SERVICES, IN EACH CASE REGARDLESS OF WHETHER PROVIDER WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE. IN NO EVENT WILL PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT

LIABILITY, AND OTHERWISE EXCEED THE TOTAL AMOUNTS PAID TO PROVIDER UNDER THIS AGREEMENT IN THE 12 MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $50,000, WHICHEVER IS LESS.

11. Term and Termination.

(a) Term. The initial term of this Agreement begins on the Effective Date and continue for the term specified on the applicable Order Form, unless terminated earlier pursuant to this Agreement's express provisions. This Agreement will automatically renew for an additional 12 months unless earlier terminated pursuant to this Agreement's express provisions or either Party gives the other Party written notice of non-renewal at least 30 days prior to the expiration of the then-current term (each a "**Renewal Term**" and together with the Initial Term, the "**Term**").

(b) Termination. In addition to any other express termination right set forth in this Agreement:

(i) Provider may terminate this Agreement, effective on written notice to Customer, if Customer: (A) fails to pay any amount when due hereunder, and such failure continues more than ten (10) days after Provider's delivery of written notice thereof; or (B) breaches any of its obligations under Section 2(c) or Section 6;

(ii) either Party may terminate this Agreement, effective on written notice to the other Party, if the other Party materially breaches this Agreement, and such breach: (A) is incapable of cure; or (B) being capable of cure, remains uncured thirty (30) days after the non-breaching Party provides the breaching Party with written notice of such breach; or

(iii) either Party may terminate this Agreement, effective immediately upon written notice to the other Party, if the other Party: (A) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (B) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (C) makes or seeks to make a general assignment for the benefit of its creditors; or (D) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(c) Effect of Expiration or Termination. Upon expiration or earlier termination of this Agreement, Customer shall and shall require its Authorized Users to immediately discontinue use of the Provider IP and, without limiting Customer's obligations under Section 6, Customer shall, and shall require its Authorized Users to delete, destroy, or return all copies of the Provider IP and certify in writing to the Provider that the Provider IP has been deleted or destroyed. No expiration or termination

will affect Customer's obligation to pay all Fees that may have become due before such expiration or termination, or entitle Customer to any refund.

(d) Survival. This Section 11(d) and Sections 1, 3, 4, 5, 6, 7, 8(b), 9, 10, and 12 survive any termination or expiration of this Agreement. No other provisions of this Agreement survive the expiration or earlier termination of this Agreement.

12. Miscellaneous.

(a) Entire Agreement. This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, and representations and warranties, both written and oral, with respect to such subject matter.

(b) Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") must be in writing and addressed to the Parties at the addresses set forth on the first page of this Agreement (or to such other address that may be designated by the Party giving Notice from time to time in accordance with this Section). All Notices must be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage pre-paid). Except as otherwise provided in this Agreement, a Notice is effective only: (i) upon receipt by the receiving Party; and (ii) if the Party giving the Notice has complied with the requirements of this Section.

(c) Force Majeure. In no event shall Provider be liable to Customer, or be deemed to have breached this Agreement, for any failure or delay in performing its obligations under this Agreement, if and to the extent such failure or delay is caused by any circumstances beyond Provider's reasonable control, including but not limited to acts of God, flood, fire, earthquake, explosion, war, terrorism, invasion, riot or other civil unrest, strikes, labor stoppages or slowdowns or other industrial disturbances, or passage of law or any action taken by a governmental or public authority, including imposing an embargo.

(d) Amendment and Modification; Waiver. No amendment to or modification of this Agreement is effective unless it is in writing and signed by an authorized representative of each Party. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, (i) no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof and (ii) no single or partial exercise of any right, remedy, power, or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(e) Severability. If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render

unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect their original intent as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(f) Governing Law; Submission to Jurisdiction. This Agreement is governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Texas. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder wil be instituted exclusively in the federal courts of the United States or the courts of the State of Texas in each case located in the city of Dallas and County of Dallas, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.

(g) Assignment. Customer may not assign any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of Provider. Any purported assignment or delegation in violation of this Section will be null and void. No assignment or delegation will relieve the assigning or delegating Party of any of its obligations hereunder. This Agreement is binding upon and inures to the benefit of the Parties and their respective permitted successors and assigns.

(h) Export Regulation. The Services utilize software and technology that may be subject to US export control laws, including the US Export Administration Act and its associated regulations. Customer shall not, directly or indirectly, export, re-export, or release the Services or the underlying software or technology to, or make the Services or the underlying software or technology accessible from, any jurisdiction or country to which export, re-export, or release is prohibited by law, rule, or regulation. Customer shall comply with all applicable federal laws, regulations, and rules, and complete all required undertakings (including obtaining any necessary export license or other governmental approval), prior to exporting, re-exporting, releasing, or otherwise making the Services or the underlying software or technology available outside the US.

(i) Equitable Relief. Each Party acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations under Section 6 or, in the case of Customer, Section 2(c), would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity or otherwise.

(j) Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

☐ I accept the terms of this Agreement

☐ I decline the terms of this Agreement

______________________________ ________________________

Authorized Signature Date

______________________________

Printed Name

______________________________

Title

______________________________

Name of Organization

Civil Action No. 24-1456

# Exhibit A-3

**Brian W. Bishop**
Attorney at Law
900 West Avenue
Austin, Texas 78701
(512) 327-5121
Fax (512) 327-5122
brian@bbishoplaw.com

June 24, 2024

*Via email, regular mail, and certified mail*
Matt Beaudreau (matt@apogeestrong.com)
Tim Kennedy (Tim@sheepdogresponse.com)
Apogee Strong Foundation
12129 N FM 620 #650
Austin, TX 78750

Re: **Acton Academy Protected Intellectual Property and Content**

Dear Sirs and/or Madams:

This firm represents Acton Academy.

Since its inception in 2009, Acton Academy has created and developed a unique and proprietary learning design that includes over 20,000 pages of proprietary materials created or woven together and includes examples, frameworks, processes, recipes, systems schedules, maps, contracts, audition funnels, challenges and launches for learners, parents, guide and owners. For example, Acton Academy has over 1100 custom Socratic launches and over 350 custom *Civilization* case discussion templates alone captured in *The Playbook* – an online secure storage system open only to authorized affiliate and their employees, and *Journey Tracker*, a proprietary learning management system protected by secure password protocols.

Acton has also created and developed a broad and deep set of tools to help guides and learners organize and lead Acton's *quest* modules. These curriculum materials, as well as other resources for guides and school leaders, are organized in the *Acton Toolshed* – an extensive online library. For example, one document in the Toolshed, for example, is a 108-page piece of curriculum that served as the basis for an eight-week Middle School quest on entrepreneurship and sales. Acton Academy is also the creator, author, developer and owner of extensive materials and content which include the following:

> ***"Customer Data": means information, data, and other content, in any form or medium, that is submitted, posted, collected, downloaded, or otherwise received, directly or indirectly from the Customer or an Authorized User by or through the Services, including, but not limited to, learning design content, curriculum, lesson plans, discussion outlines, assignments, lesson plans, course outlines, school ana studio processes, user contributions and submissions, marketing***

***materials, emails, templates, frameworks, notes, videos, case studies, User Contributions, and any and all Customer and Authorized User permitted modifications to Provider Content.***

***"Documentation": means Provider's user manuals, handbooks, and guides relating to the Services provided by Provider to Customer either electronically or in hard copy form.***

***"Provider IP"**: means the **Services, the Documentation, Provider Content, and any and all intellectual property provided to Customer or any Authorized User in connection with the-foregoing or anything created as a result of this Agreement.***

***"Provider Content"**: means **learning content that Provider provides to its Customers through the Services, including, but not limited to, learning design content curriculum, discussion outlines, assignments, lesson plans, course outlines, school and studio processes, user contributions and submissions (i.e., examples of past student work), marketing materials, emails, templates, frameworks, notes, videos, case studies, and handbooks created by Provider for Customer and Authorized User's use with the Services.***

***"Services"** means the services provided by Provider.*

Acton Academy's materials and content are legally protected and secured by Acton's *Welcome Letter*, *Trademark License Agreement,* and *Access and Use Agreement* – all of which must be acknowledged and accepted for an affiliate or its employees to access Acton Academy's learning design and content. Acton Academy requires – as a condition of an affiliate's access to and use of Acton's Content – that affiliates sign and agree to **Acton's Access and License Agreement** which provides, among other things:

*This Access and License Agreement (this **"Agreement"),** is by and between Acton Academy, a Texas non-profit corporation **("Provider")** and you **("Customer," "you,"** or **"your").** Provider and Customer may be referred to herein collectively as the **"Parties"** or individually as **"Party."** This Agreement governs your access to and use of the Services, as hereinafter defined.*

*1. <u>Definitions.</u>*

*... **(b) "Customer Data" means information, data, and other content, in any form or medium, that is submitted, posted, collected, downloaded, or otherwise received, directly or indirectly from the Customer or an Authorized User by or through the Services, including, but not limited to, learning design content, curriculum, lesson plans, discussion outlines, assignments, lesson plans, course***

***outlines, school ana studio processes, user contributions and submissions, marketing materials, emails, templates, frameworks, notes, videos, case studies, User Contributions, and any and all Customer and Authorized User permitted modifications to Provider Content.***

***(c) "Documentation" means Provider's user manuals, handbooks, and guides relating to the Services provided by Provider to Customer either electronically or in hard copy form.***

*(e)* ***"Provider IP"*** *means the* ***Services, the Documentation, Provider Content, and any and all intellectual property provided to Customer or any Authorized User in connection with the-foregoing or anything created as a result of this Agreement.***

*(f)* ***"Provider Content"*** *means* ***learning content that Provider provides to its Customers through the Services, including, but not limited to, learning design content curriculum, discussion outlines, assignments, lesson plans, course outlines, school and studio processes, user contributions and submissions (i.e., examples of past student work), marketing materials, emails, templates, frameworks, notes, videos, case studies, and handbooks created by Provider for Customer and Authorized User's use with the Services.***

*2. <u>Access and Use.</u>*

*(a) Provision of Access. Subject to the terms and conditions of this Agreement, Provider hereby grants Customer and its Authorized Users a non-exclusive, non-transferable (except in compliance with Section 12(g)) right to access and use the Services during the Term, solely for use by Customer and its Authorized Users in accordance with the terms and conditions herein. Such use is limited to Customer and its Authorized User's internal use. Provider shall provide to Customer the necessary passwords and network links or connections to allow Customer to access the Services and to facilitate access for the Authorized Users.*

*(b) License. Subject to the terms and conditions contained in this Agreement, Provider hereby grants to Customer and 'ts Authorized Users a non-exclusive, non-sublicenseable, non-transferable (except in compliance with Section 12(g)) license to use the Provider Content and Documentation during the Term solely for Customer and its Authorized User's internal business purposes in connection with use of the Services.*

***(c) Use Restrictions. Customer shall not use and shall prohibit its Authorized Users from using the Services for any purposes beyond the scope of the access***

***granted in this Agreement. Customer shall not at any time, directly or indirectly, and shall not permit any Authorized Users to: (i) copy, modify, or create derivative works of the Services or Documentation, in whole or in part;*** *(ii) rent, lease, lend, sell, license, sublicense, assign, distribute, publish, transfer, or otherwise make available the Services or Documentation; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part; (iv) remove any proprietary notices from the Services or Documentation; (v) use the Services or Documentation in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law (vi) transmit, or procure the sending of, any advertising or promotional material, including any "junk mail", "chain letter" or "spam" or any other similar solicitation… Use of Provider Content shall be restricted for use only in connection with recruiting and advertising of Customer's services and further, such disclosure shall be limited only to discrete portions of Provider Content sufficient to aid such recruiting and advertising…*

***3. Customer Responsibilities. Customer is responsible and liable for all uses of the Provider IP and Customer Data resulting from access provided by Customer, directly or indirectly, whether such access or use is permitted by or in violation of this Agreement****. Without limiting the generality of the foregoing, Customer is responsible for all acts and omissions of all Authorized Users, and any act or omission by an Authorized User that would constitute a breach of this Agreement if taken by Customer will be deemed a breach of this Agreement by Customer. Customer shall use reasonable efforts to make all Authorized Users aware of this Agreement's provisions as applicable to such Authorized User's use of the Services, and shall cause Authorized Users to comply with such provisions.*

*6. Confidential Information. From time to time during the Term, either Party may disclose or make available to the other* ***Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media [in written or electronic form or media], whether or not marked, designated or otherwise identified as "confidential" (collectively, "Confidential Information").*** *Confidential Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Patty at the time of disclosure; ( c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; or ( d) independently developed by the receiving Party.* ***The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees or authorized persons who***

***have a need to know the Confidential Information for the receiving Party to exercise its rights or perform its obligations hereunder… On the expiration or termination of the Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed.*** *Each Party's obligations of non-disclosure with regard to Confidential Information are effective as of the Effective Date and will expire five years from the date first disclosed to the receiving Party; provided, however,* ***with respect to any Confidential Information that constitutes a trade secret (as determined under applicable law), such obligations of non-disclosure will survive the termination or expiration of this Agreement for as long as such Confidential Information remains subject to trade secret protection under applicable law.***

*7. Intellectual Property Ownership. Customer acknowledges that, as between Customer and Provider, Provider owns all right, title, and interest, including all intellectual property rights, in and to the Provider IP and, with respect to Third-Party Products, the applicable third-party providers own all right, title, and interest, including all intellectual property rights, in and to the Third-Party Products…*

*(b) Customer Indemnification. Customer shall indemnify, hold harmless, and, at Provider's option, defend Provider from and against any Losses resulting from any Third-Patty Claim that the Customer Data, or any use of the Customer Data in accordance with this Agreement, infringes or misappropriates such third party's intellectual property rights and any Third-Party Claims based on Customer's or any Authorized User's (i) negligence or willful misconduct; (ii) use of the Services in a manner not authorized by this Agreement, including posting infringing materials or any defamatory statements on chat boards or forums or the like; (iii) use of the Services in combination with data, software, hardware, equipment or technology not provided by Provider or authorized by Provider in writing; or (iv) modifications to the Services not made by Provider, provided that Customer may not settle any Third-Party Claim against Provider unless Provider consents to such settlement, and further provided that Provider will have the right, at its option, to defend itself against any such Third-Party Claim or to participate in the defense thereof by counsel of its own choice…*

***(c) Effect of Expiration or Termination. Upon expiration or earlier termination of this Agreement, Customer shall and shall require its Authorized Users to immediately discontinue use of the Provider IP and, without limiting Customer's obligations under Section 6, Customer shall, and shall require its Authorized***

> ***Users to delete, destroy, or return all copies to the Provider IP and certify in writing to the Provider that the Provider IP has been deleted or destroyed****...*
>
> *(d) Survival. This Section 1 l(d) and Sections* ***1,*** *3, 4, 5, 6, 7, 8(b), 9, 10, and 12 survive any termination or expiration of this Agreement or other provisions of this Agreement survive the expiration or earlier termination of this Agreement.*

In addition to Acton's ***Access and License Agreement***, Acton's ***Trademark License Agreement*** provides in relevant part:

> *Licensor is the owner of all rights, title and interest in and to* ***the name and trademark "ACTON ACADEMY" and all goodwill associated therewith (the "Name')…***
>
> ***Licensee recognizes the great value of the goodwill associated with the Name and acknowledges that the Name and the goodwill pertaining thereto belong exclusively to Licensor****. Licensee shall not during the Term of this Agreement, or thereafter, attack the title or any right or interest of Licensor in and to the Name or attack the validity of this License.*
>
> ***7. Effect of Termination.***
>
> *a. Upon and after the Termination of the Agreement, all rights granted to Licensee hereunder shall forthwith revert to Licensor, and within six ( 6) months following the Termination of the Agreement, Licensee will cease, and forever refrain from, all use or employment of the Name or anything deemed by Licensor to be similar to the Name, whether alone or in combination with any other word, symbol, or design, in connection with, without limitation, any and all advertising and promotional materials, signage, letterhead, printed materials, brochures, emblems, domain name uses including the Domain Name and all content associated therewith, email advertising, email messages, phone solicitation and phone answering, telephone directories and listings, visible pages of any website or electronic bulletin board, metatags and search keywords.*
>
> ***b. At the Termination of this Agreement, Licensee shall be deemed to have assigned, transferred and conveyed to Licensor any right in and to the Name, and any associated goodwill, which may have been obtained by Licensee, or which may have vested in Licensee in pursuit of offering goods or services, or through use of the Name in accordance with this Agreement, and Licensee shall execute any instruments requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement****…*

Acton Academy has documented hundreds of examples of words, phrases and the structure and elements of the Acton learning design that Acton authored and created, and that are unusual, unique, proprietary, and not seen in combination in other programs that, on information and belief, Apogee – and Apogee affiliated schools – have appropriated and are currently using in whole or in substantial part and without Acton's approval or consent:

**Key Acton Words, Phrases and Learning Design Stolen by Apogee**

- *The Hero's Journey*- the key organizing concept for Acton's learning design. (Acton Academy is the only K12 school we are aware of that uses this as its organizing principle)
- "*Learner-driven*" as a term to describe the educational approach and used rarely if at all by other schools.
- Labeling students as "*Hero's*" or "*Learners*." Acton is the only school we believe uses these terms
- "*Equip*" learners to "*develop their God given talents and gifts*" is lifted almost verbatim from Acton's content.
- Language referring to children as "*geniuses*" who will "*find a calling*" and "*change the world*" is lifted almost verbatim from Acton's mission statement and promises.
- "*Guides*" as a word for "teacher." Referring to a teacher as a "*guide*" or "*Socratic guide*" are terms used by Acton.
- Small mixed age classrooms called "*studios*" which is a term used by Acton.
- "*A badge system*" to "*track progress*" and a promise of "no grades" lifted directly from Acton.
- "*Servant Leadership*" is an Acton term to describe learners in one studio serving another.
- An 11 month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "quests" to develop real world skills – all Acton concepts and procedures.
- Apogee's daily schedules seem to be appropriated directly from Acton, including 2 – 3 "*Socratic launches*" in a day, *D.E.A.R* ("*Drop everything and read time*" and "*Core Skills*" in the morning and "*Quests*" in the afternoon. Acton created these combinations of activities and established several of the terms.
- "*We believe children are far more capable than you ever imagined*" – this is an original Acton phrase Apogee appropriated from Acton's website. Acton has documented at least ten examples of Apogee using this unique phrase in Apogee's promotional materials.
- *Peace corner* – a term used in Acton studios.
- A promise of "no homework" - unusual for a school to promise no homework, and a key Acton promise.

- Apogee FAQ text often is appropriated verbatim from Acton website. For example, an Apogee answer to a question about Montessori methods is copied directly from Acton's website.
- Apogee language for job postings is appropriated directly from Acton's job postings.
- "*We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know*" – this is copied word for word from Acton's beliefs.
- Apogee's *Children's Business Fair* – this is a direct appropriation from Acton's *Children's Business Fair*.
- Apogee: "*Our mission is to inspire each person who enters our doors to find a calling and change the world*" – this is copied verbatim from Acton's mission statement:

The terms of Acton's *Access and License Agreement* prevent the use of Acton's *Customer Data*, *Documentation*, *Provider IP*, *Provider Content*, *Confidential Information*, and *Services* by any third party without authorization or for purposes or uses outside of the Acton ***Access and License Agreement***. Likewise, Acton's *Trademark License Agreement* prevents the use by any third party of Acton's name, trademark and goodwill without authorization or for any purpose or use outside of the *Trademark License Agreement* and *Access and License Agreement*. Acton Academy's content are also trade secrets as defined by Tex. Civ. Prac. & Rem. Code §134 A.001, et seq. To the extent that - Apogee's affiliated schools are using content that is proprietary to Acton Academy and protected by Acton's Access and *License Agreement* and/or *Trademark License Agreement*, that use is a violation of Acton's contract and intellectual property rights.

This letter constitutes formal and legal demand that all Apogee affiliated schools immediately cease and desist from the following:

1. Representing to parents and children that Apogee and its affiliates having opened or operating a school "Just like Acton" by using any Acton terms, phrases concepts, or content.

2. Including utilizing or publishing the following in Apogee's website, marketing, promotion, curriculum, communications or other content:

    - the terms or phrases "*The Hero's Journey*"
    - the terms or phrases "*Learner-driven*"
    - Labeling students as "*Hero's*" or "*Learners*"
    - Using language to the effect that Apogee "*equips*" learners to "*develop their God given talents and gifts*"

- Language referring to children as "*geniuses*" who will "*find a calling*" and "*change the world*"
- Utilizing "*Guides*" as a word for "teacher."
- Referring to a teacher as a "*guide*" or "*Socratic guide.*"
- Referring to classrooms as "*studios*"
- Referring to "*A badge system*" to "*track progress*" and a promise of "no grades"
- Utilizing the term or phrase "*Servant Leadership*" as a term to describe learners in one studio serving another.
- Utilizing an 11-month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "quests" to develop real world skills (all Acton concepts and procedures).
- Utilizing daily schedules appropriated directly from Acton, including 2 – 3 "*Socratic launches*" a day, *D.E.A.R* ("*Drop Everything And Read Rime*" and "*Core Skills*" in the morning and "*Quests*" in the afternoon.
- Utilizing the term or phrase "*We believe children are far more capable than you ever imagined.*"
- Utilizing the term or phrase "*Peace corner.*"
- Utilizing answers, terms or phrases in Apogee's FAQ that have previously been authored or credited by Acton.
- Utilizing language for Apogee job postings that have previously been authored or created by Acton in Acton's job postings.
- Utilizing the term or phrase "*We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know*."
- Utilizing the term or phrase "*Children's Business Fair*."
- Utilizing the term or phrase "*Our mission is to inspire each person who enters our doors to find a calling and change the world*"

In addition, Acton respectfully demands that Acton be allowed the opportunity to review the Apogee affiliate school curriculum and material that Apogee is providing to Apogee School affiliates in order to review compliance with (or violation of) Acton's trademarks, copyrights, agreements, and property rights.

Thank you for your cooperation and courtesy.

Yours very truly,

Brian W. Bishop

Civil Action No. 24-1456

# Exhibit A-4

**Brian W. Bishop**
Attorney at Law
900 West Avenue
Austin, Texas 78701
(512) 327-5121
Fax (512) 327-5122
brian@bbishoplaw.com

June 25, 2024

*Via email, regular mail, and certified mail*
**Apogee Cedar Park**
Matt Beaudreau (matt@apogeestrong.com)
Tim Kennedy (Tim@apogeestrong.com)
12129 N FM 620 #650
Austin, TX 78750

Re: **Acton Academy Protected Intellectual Property and Content**

Dear Sirs and/or Madams:

This firm represents Acton Academy.

Since its inception in 2009, Acton Academy has created and developed a unique and proprietary learning design that includes over 20,000 pages of proprietary materials created or woven together and includes examples, frameworks, processes, recipes, systems schedules, maps, contracts, audition funnels, challenges and launches for learners, parents, guide and owners. For example, Acton Academy has over 1100 custom Socratic launches and over 350 custom *Civilization* case discussion templates alone captured in *The Playbook* – an online secure storage system open only to authorized affiliate and their employees, and *Journey Tracker*, a proprietary learning management system protected by secure password protocols.

Acton has also created and developed a broad and deep set of tools to help guides and learners organize and lead Acton's *quest* modules. These curriculum materials, as well as other resources for guides and school leaders, are organized in the *Acton Toolshed* – an extensive online library. For example, one document in the Toolshed, for example, is a 108-page piece of curriculum that served as the basis for an eight-week Middle School quest on entrepreneurship and sales. Acton Academy is also the creator, author, developer and owner of extensive materials and content which include the following:

> ***"Customer Data": means information, data, and other content, in any form or medium, that is submitted, posted, collected, downloaded, or otherwise received, directly or indirectly from the Customer or an Authorized User by or through the Services, including, but not limited to, learning design content, curriculum, lesson plans, discussion outlines, assignments, lesson plans, course outlines, school ana studio processes, user contributions and submissions, marketing***

> ***materials, emails, templates, frameworks, notes, videos, case studies, User Contributions, and any and all Customer and Authorized User permitted modifications to Provider Content.***
>
> ***"Documentation"*: *means Provider's user manuals, handbooks, and guides relating to the Services provided by Provider to Customer either electronically or in hard copy form.***
>
> ***"Provider IP"*: *means the* Services, the Documentation, Provider Content, and any and all intellectual property provided to Customer or any Authorized User in connection with the-foregoing or anything created as a result of this Agreement.**
>
> ***"Provider Content"*: *means* learning content that Provider provides to its Customers through the Services, including, but not limited to, learning design content curriculum, discussion outlines, assignments, lesson plans, course outlines, school and studio processes, user contributions and submissions (i.e., examples of past student work), marketing materials, emails, templates, frameworks, notes, videos, case studies, and handbooks created by Provider for Customer and Authorized User's use with the Services.***
>
> ***"Services"*** *means the services provided by Provider.*

Acton Academy's materials and content are legally protected and secured by Acton's *Welcome Letter*, *Trademark License Agreement,* and *Access and Use Agreement* – all of which must be acknowledged and accepted for an affiliate or its employees to access Acton Academy's learning design and content. Acton Academy requires – as a condition of an affiliate's access to and use of Acton's Content – that affiliates sign and agree to **Acton's Access and License Agreement** which provides, among other things:

> *This Access and License Agreement (this* ***"Agreement"),*** *is by and between Acton Academy, a Texas non-profit corporation* ***("Provider")*** *and you* ***("Customer," "you,"*** *or* ***"your").*** *Provider and Customer may be referred to herein collectively as the* ***"Parties"*** *or individually as* ***"Party."*** *This Agreement governs your access to and use of the Services, as hereinafter defined.*
>
> *1. Definitions.*
>
> *…* ***(b) "Customer Data" means information, data, and other content, in any form or medium, that is submitted, posted, collected, downloaded, or otherwise received, directly or indirectly from the Customer or an Authorized User by or through the Services, including, but not limited to, learning design content, curriculum, lesson plans, discussion outlines, assignments, lesson plans, course outlines, school ana studio processes, user contributions and submissions,***

***marketing materials, emails, templates, frameworks, notes, videos, case studies, User Contributions, and any and all Customer and Authorized User permitted modifications to Provider Content.***

***(c) "Documentation" means Provider's user manuals, handbooks, and guides relating to the Services provided by Provider to Customer either electronically or in hard copy form.***

*(e)* ***"Provider IP"*** *means the* ***Services, the Documentation, Provider Content, and any and all intellectual property provided to Customer or any Authorized User in connection with the-foregoing or anything created as a result of this Agreement.***

*(f)* ***"Provider Content"*** *means* ***learning content that Provider provides to its Customers through the Services, including, but not limited to, learning design content curriculum, discussion outlines, assignments, lesson plans, course outlines, school and studio processes, user contributions and submissions (i.e., examples of past student work), marketing materials, emails, templates, frameworks, notes, videos, case studies, and handbooks created by Provider for Customer and Authorized User's use with the Services.***

*2. Access and Use.*

*(a) Provision of Access. Subject to the terms and conditions of this Agreement, Provider hereby grants Customer and its Authorized Users a non-exclusive, non-transferable (except in compliance with Section 12(g)) right to access and use the Services during the Term, solely for use by Customer and its Authorized Users in accordance with the terms and conditions herein. Such use is limited to Customer and its Authorized User's internal use. Provider shall provide to Customer the necessary passwords and network links or connections to allow Customer to access the Services and to facilitate access for the Authorized Users.*

*(b) License. Subject to the terms and conditions contained in this Agreement, Provider hereby grants to Customer and 'ts Authorized Users a non-exclusive, non-sublicenseable, non-transferable (except in compliance with Section 12(g)) license to use the Provider Content and Documentation during the Term solely for Customer and its Authorized User's internal business purposes in connection with use of the Services.*

***(c) Use Restrictions. Customer shall not use and shall prohibit its Authorized Users from using the Services for any purposes beyond the scope of the access granted in this Agreement. Customer shall not at any time, directly or indirectly,***

***and shall not permit any Authorized Users to: (i) copy, modify, or create derivative works of the Services or Documentation, in whole or in part;*** *(ii) rent, lease, lend, sell, license, sublicense, assign, distribute, publish, transfer, or otherwise make available the Services or Documentation; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part; (iv) remove any proprietary notices from the Services or Documentation; (v) use the Services or Documentation in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law (vi) transmit, or procure the sending of, any advertising or promotional material, including any "junk mail", "chain letter" or "spam" or any other similar solicitation… Use of Provider Content shall be restricted for use only in connection with recruiting and advertising of Customer's services and further, such disclosure shall be limited only to discrete portions of Provider Content sufficient to aid such recruiting and advertising…*

***3. Customer Responsibilities. Customer is responsible and liable for all uses of the Provider IP and Customer Data resulting from access provided by Customer, directly or indirectly, whether such access or use is permitted by or in violation of this Agreement****. Without limiting the generality of the foregoing, Customer is responsible for all acts and omissions of all Authorized Users, and any act or omission by an Authorized User that would constitute a breach of this Agreement if taken by Customer will be deemed a breach of this Agreement by Customer. Customer shall use reasonable efforts to make all Authorized Users aware of this Agreement's provisions as applicable to such Authorized User's use of the Services, and shall cause Authorized Users to comply with such provisions.*

*6. Confidential Information. From time to time during the Term, either Party may disclose or make available to the other* ***Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media [in written or electronic form or media], whether or not marked, designated or otherwise identified as "confidential" (collectively, "Confidential Information").*** *Confidential Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Patty at the time of disclosure; ( c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; or ( d) independently developed by the receiving Party.* ***The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees or authorized persons who have a need to know the Confidential Information for the receiving Party to***

***exercise its rights or perform its obligations hereunder… On the expiration or termination of the Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed.*** *Each Party's obligations of non-disclosure with regard to Confidential Information are effective as of the Effective Date and will expire five years from the date first disclosed to the receiving Party; provided, however,* ***with respect to any Confidential Information that constitutes a trade secret (as determined under applicable law), such obligations of non-disclosure will survive the termination or expiration of this Agreement for as long as such Confidential Information remains subject to trade secret protection under applicable law.***

*7. Intellectual Property Ownership. Customer acknowledges that, as between Customer and Provider, Provider owns all right, title, and interest, including all intellectual property rights, in and to the Provider IP and, with respect to Third-Party Products, the applicable third-party providers own all right, title, and interest, including all intellectual property rights, in and to the Third-Party Products…*

*(b) Customer Indemnification. Customer shall indemnify, hold harmless, and, at Provider's option, defend Provider from and against any Losses resulting from any Third-Patty Claim that the Customer Data, or any use of the Customer Data in accordance with this Agreement, infringes or misappropriates such third party's intellectual property rights and any Third-Party Claims based on Customer's or any Authorized User's (i) negligence or willful misconduct; (ii) use of the Services in a manner not authorized by this Agreement, including posting infringing materials or any defamatory statements on chat boards or forums or the like; (iii) use of the Services in combination with data, software, hardware, equipment or technology not provided by Provider or authorized by Provider in writing; or (iv) modifications to the Services not made by Provider, provided that Customer may not settle any Third-Party Claim against Provider unless Provider consents to such settlement, and further provided that Provider will have the right, at its option, to defend itself against any such Third-Party Claim or to participate in the defense thereof by counsel of its own choice…*

***(c) Effect of Expiration or Termination. Upon expiration or earlier termination of this Agreement, Customer shall and shall require its Authorized Users to immediately discontinue use of the Provider IP and, without limiting Customer's obligations under Section 6, Customer shall, and shall require its Authorized***

> ***Users to delete, destroy, or return all copies to the Provider IP and certify in writing to the Provider that the Provider IP has been deleted or destroyed****...*
>
> *(d) Survival. This Section 1 l(d) and Sections* ***1,*** *3, 4, 5, 6, 7, 8(b), 9, 10, and 12 survive any termination or expiration of this Agreement or other provisions of this Agreement survive the expiration or earlier termination of this Agreement.*

In addition to Acton's ***Access and License Agreement***, Acton's ***Trademark License Agreement*** provides in relevant part:

> *Licensor is the owner of all rights, title and interest in and to* ***the name and trademark "ACTON ACADEMY" and all goodwill associated therewith (the "Name')…***
>
> ***Licensee recognizes the great value of the goodwill associated with the Name and acknowledges that the Name and the goodwill pertaining thereto belong exclusively to Licensor****. Licensee shall not during the Term of this Agreement, or thereafter, attack the title or any right or interest of Licensor in and to the Name or attack the validity of this License.*
>
> ***7. Effect of Termination.***
>
> *a. Upon and after the Termination of the Agreement, all rights granted to Licensee hereunder shall forthwith revert to Licensor, and within six ( 6) months following the Termination of the Agreement, Licensee will cease, and forever refrain from, all use or employment of the Name or anything deemed by Licensor to be similar to the Name, whether alone or in combination with any other word, symbol, or design, in connection with, without limitation, any and all advertising and promotional materials, signage, letterhead, printed materials, brochures, emblems, domain name uses including the Domain Name and all content associated therewith, email advertising, email messages, phone solicitation and phone answering, telephone directories and listings, visible pages of any website or electronic bulletin board, metatags and search keywords.*
>
> ***b. At the Termination of this Agreement, Licensee shall be deemed to have assigned, transferred and conveyed to Licensor any right in and to the Name, and any associated goodwill, which may have been obtained by Licensee, or which may have vested in Licensee in pursuit of offering goods or services, or through use of the Name in accordance with this Agreement, and Licensee shall execute any instruments requested by Licensor to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual covenants and considerations of this Agreement****...*

Acton Academy has documented hundreds of examples of words, phrases and the structure and elements of the Acton learning design that Acton authored and created, and that are unusual, unique, proprietary, and not seen in combination in other programs that, on information and belief, Apogee – and Apogee affiliated schools – are currently using in whole or in substantial part and without Acton's approval or consent:

**Key Acton Words, Phrases and Learning Design Stolen by Apogee**

- *The Hero's Journey*- the key organizing concept for Acton's learning design. (Acton Academy is the only K12 school we are aware of that uses this as its organizing principle)
- "*Learner-driven*" as a term to describe the educational approach and used rarely if at all by other schools.
- Labeling students as "*Hero's*" or "*Learners*." Acton is the only school we believe uses these terms
- "*Equip*" learners to "*develop their God given talents and gifts*" is lifted almost verbatim from Acton's content.
- Language referring to children as "*geniuses*" who will "*find a calling*" and "*change the world*" is lifted almost verbatim from Acton's mission statement and promises.
- "*Guides*" as a word for "teacher." Referring to a teacher as a "*guide*" or "*Socratic guide*" are terms used by Acton.
- Small mixed age classrooms called "*studios*" which is a term used by Acton.
- "*A badge system*" to "*track progress*" and a promise of "no grades" lifted directly from Acton.
- "*Servant Leadership*" is an Acton term to describe learners in one studio serving another.
- An 11 month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "quests" to develop real world skills – all Acton concepts and procedures.
- Apogee's daily schedules seem to be appropriated directly from Acton, including 2 – 3 "*Socratic launches*" in a day, *D.E.A.R* ("*Drop everything and read time*" and "*Core Skills*" in the morning and "*Quests*" in the afternoon. Acton created these combinations of activities and established several of the terms.
- "*We believe children are far more capable than you ever imagined*" – this is an original Acton phrase Apogee appropriated from Acton's website. Acton has documented at least ten examples of Apogee using this unique phrase in Apogee's promotional materials.
- *Peace corner* – a term used in Acton studios.
- A promise of "no homework" - unusual for a school to promise no homework, and a key Acton promise.

- Apogee FAQ text often is appropriated verbatim from Acton website. For example, an Apogee answer to a question about Montessori methods is copied directly from Acton's website.
- Apogee language for job postings is appropriated directly from Acton's job postings.
- "*We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know*" – this is copied word for word from Acton's beliefs.
- Apogee's *Children's Business Fair* – this is a direct appropriation from Acton's *Children's Business Fair*.
- Apogee: "*Our mission is to inspire each person who enters our doors to find a calling and change the world*" – this is copied verbatim from Acton's mission statement:

The terms of Acton's *Access and License Agreement* prevent the use of Acton's *Customer Data*, *Documentation*, *Provider IP*, *Provider Content*, *Confidential Information*, and *Services* by any third party without authorization or for purposes or uses outside of the Acton ***Access and License Agreement***. Likewise, Acton's *Trademark License Agreement* prevents the use by any third party of Acton's name, trademark and goodwill without authorization or for any purpose or use outside of the *Trademark License Agreement* and *Access and License Agreement*. Acton Academy's content are also trade secrets as defined by Tex. Civ. Prac. & Rem. Code §134 A.001, et seq. To the extent that Apogee's affiliated schools are using content that is proprietary to Acton Academy and protected by Acton's Access and *License Agreement* and/or *Trademark License Agreement*, that use is a violation of Acton's contract and intellectual property rights.

This letter constitutes formal and legal demand that all Apogee affiliated schools immediately cease and desist from the following:

1. Representing to parents or children that Apogee and its affiliates having opened or operating a school "Just like Acton" by using any Acton terms, phrases concepts, or content.

2. Including utilizing or publishing the following in Apogee's website, marketing, promotion, curriculum, communications or other content:

   - the terms or phrases "*The Hero's Journey*"
   - the terms or phrases "*Learner-driven*"
   - Labeling students as "*Hero's*" or "*Learners*"
   - Using language to the effect that Apogee "*equips*" learners to "*develop their God given talents and gifts*"
   - Language referring to children as "*geniuses*" who will "*find a calling*" and "*change the world*"

- Utilizing "*Guides*" as a word for "teacher."
- Referring to a teacher as a "*guide*" or "*Socratic guide.*"
- Referring to classrooms as "*studios*"
- Referring to "*A badge system*" to "*track progress*" and a promise of "no grades"
- Utilizing the term or phrase "*Servant Leadership*" as a term to describe learners in one studio serving another.
- Utilizing an 11-month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "quests" to develop real world skills (all Acton concepts and procedures).
- Utilizing daily schedules appropriated directly from Acton, including 2 – 3 "*Socratic launches*" a day, *D.E.A.R* (“*Drop Everything And Read Rime*" and "*Core Skills*" in the morning and "*Quests*" in the afternoon.
- Utilizing the term or phrase "*We believe children are far more capable than you ever imagined.*"
- Utilizing the term or phrase “*Peace corner.*”
- Utilizing answers, terms or phrases in Apogee’s FAQ that have previously been authored or credited by Acton.
- Utilizing language for Apogee job postings that have previously been authored or created by Acton in Acton’s job postings.
- Utilizing the term or phrase "*We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know*.”
- Utilizing the term or phrase “*Children's Business Fair*.”
- Utilizing the term or phrase “*Our mission is to inspire each person who enters our doors to find a calling and change the world*”

In addition, Acton respectfully demands that Acton be allowed the opportunity to review the Apogee affiliate school curriculum and material that Apogee has provided to Apogee School affiliates in order to review compliance with (or potential violation of) Acton’s trademarks, copyrights, agreements, and property rights.

Thank you for your cooperation and courtesy.

Yours very truly,

Brian W. Bishop

# Exhibit A-5

**Brian Bishop**

---

**From:** Matt Beaudreau <matt@apogeestrong.com>
**Sent:** Tuesday, July 2, 2024 12:06 PM
**To:** Brian Bishop
**Cc:** Carl Cringle; Maike Kellner; Tim Kennedy
**Subject:** Re: Acton Academy: Proprietary and Protected Content

Brian-

The first part of the below email shows what has gone to our affiliates. The second part (noted in the text) is just a response for you and the Acton team.

---

Hi All!

As you can see, we've updated the Apogee Cedar Park website to be in line with all things Apogee, as opposed to being an old Acton site.

If you received a letter from Acton, it's likely that you had something on your site that was mirroring what was on the ACP site, and Acton rightfully took notice.

That's on us for not getting the ACP crew/site updated, but it's an easy fix. We are glad to fix it for you, but we do need to fix it and show that we are not using anything that belongs to them.

We are also glad to have you update it yourself. Whatever you prefer.

Here is what Acton is asking us to remove from the sites, with my responses in red.

- The Hero's Journey- the key organizing concept for Acton's learning design. (Acton Academy is the only K12 school we are aware of that uses this as its organizing principle) Joseph Campbell helped coin the term, but we don't use that in our verbiage or as an organizing principle. We don't have to stray away from ever speaking of it for academic purposes, but we can easily make sure it's not prominent on our sites.

- "Learner-driven" as a term to describe the educational approach and used rarely if at all by other schools. We can remove this. We are student focused in many ways, but are not seeking to build a complete K-12 campus that is "learner-driven". We believe in inspirational coaches who use intentional coaching to make progress, much like a gym/martial arts studio would. We are very much involved. We answer questions. We give and help tweak tools.
- Labeling students as "Hero's" or "Learners." Acton is the only school we believe uses these. Not a foundational principle for us in the same context as the Hero's Journey isn't foundational for us, and learners is something that is found even in traditional conveyor belt schools. In our conversations, we've said everything from learners and students to heroes and leaders. We can stick with something more along the lines of leaders, because that's part of our tagline.
- Equip" learners to "develop their God given talents and gifts" is lifted almost verbatim from Acton's content. Definitely leftover remnants of the old Acton website, and should be removed.
- Language referring to children as "geniuses" who will "find a calling" and "change the world" is lifted almost verbatim from Acton's mission statement and promises. Definitely leftover remnants of the old Acton website, and should be removed.

- Guides" as a word for "teacher." Referring to a teacher as a "guide" or "Socratic guide" are terms used by Acton. While we almost always use the phrase "coaches" because of the way we intentionally interact with students (again- far from an Acton philosophy- we believe coaches should answer questions and should be an integral part of the process) some owners have used the term "guide" in conversation or in posting, partially because of their Montessori backgrounds or affiliations. "Coaching" is our bread and butter, but "guiding" is not a term that is solely owned by Acton. None of our coaches are inherently "Socratic Guides", so that's fine to remove.
- Small mixed age classrooms called "studios" which is a term used by Acton. Studio is also used in martial arts gyms, which is more akin to the way we operate. Not opposed to calling them pods, classrooms, etc.
- A badge system" to "track progress" and a promise of "no grades" lifted directly from Acton. We want to change this verbiage. While the "badge system" is something that boy scouts also use, we have a belt/stripe system, and are continuously developing "mini-projects" for points. We don't have a badge system. The concept of "no grades" is also not inherently an Acton thing, and we are ok not to be assigning grades.
- Servant Leadership" is an Acton term to describe learners in one studio serving another. Again- far from being solely an Acton term, but not necessarily anything foundational to what we are talking about.
- An 11 month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "quests" to develop real world skills – all Acton concepts and procedures. Schedules for campuses vary widely. Some are more traditional. Some year round. Some are in 4-6 week chunks like this. Some are not. Some are 2, 3, 4, or 5 days a week. We don't use the term "quests" at all. Projects, yes. Quests, no.
- Apogee's daily schedules seem to be appropriated directly from Acton, including 2 – 3 "Socratic launches" in a day, D.E.A.R ("Drop everything and read time" and "Core Skills" in the morning and "Quests" in the afternoon. Acton created these combinations of activities and established several of the terms. That was or is to be taken off of the website to represent something that is more Apogee's schedule, though campuses will vary. We won't be using "Socratic launches", "DEAR", or "Quests". Those were all remnants of the old Acton site that have been/are being removed.
- We believe children are far more capable than you ever imagined" – this is an original Acton phrase Apogee appropriated from Acton's website. Acton has documented at least ten examples of Apogee using this unique phrase in Apogee's promotional materials. Definitely remnants of the old Acton website, and should be removed.
- Peace corner – a term used in Acton studios. Definitely remnants of the old Acton website and should be removed.
- A promise of "no homework" - unusual for a school to promise no homework, and a key Acton promise. We don't follow the same narrative of "promises", but not assigning homework is not anything that Acton stands alone in.
- Apogee FAQ text often is appropriated verbatim from Acton website. For example, an Apogee answer to a question about Montessori methods is copied directly from Acton's Website. Definitely remnants of the old Acton website, and should be removed.
- Apogee language for job postings is appropriated directly from Acton's job postings. Definitely remnants of the old Acton website, and should be removed.
- We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know" – this is copied word for word from Acton's Beliefs. Definitely remnants of the old Acton website, and should be removed.
- Apogee's Children's Business Fair – this is a direct appropriation from Acton's Children's Business Fair. Definitely remnants of the old Acton website, and should be removed.

- Apogee: "Our mission is to inspire each person who enters our doors to find a calling and change the world" – this is copied verbatim from Acton's mission statement: Definitely remnants of the old Acton website, and should be removed.

This letter constitutes formal and legal demand that all Apogee affiliated schools immediately cease and desist from the following:

1. Representing to parents and children that Apogee and its affiliates having opened or operating a school "Just like Acton" by using any Acton terms, phrases concepts, or Content. We have never said nor would we ever say that we are doing anything "just like Acton ", nor would we say we are "just like " anyone else. There is no other system that mirrors ours in the least, and all materials are fully Apogee IP with the obvious exceptions of open source resources, textbooks, etc.

2. Including utilizing or publishing the following in Apogee's website, marketing, promotion, curriculum, communications or other content:

• the terms or phrases "The Hero's Journey" Again- other schools also use this, but we are glad to refrain since it's not a foundational narrative for us.

• the terms or phrases "Learner-driven" We are student-centered, family-oriented, sovereignty minded, and mastery-driven.
• Labeling students as "Hero's" or "Learners" See above response to this.

• Using language to the effect that Apogee "equips" learners to "develop their God given talents and gifts" Remnants of the old Acton website that needs to be removed.

• Language referring to children as "geniuses" who will "find a calling" and "change the World" Remnants of the old Acton website that needs to be removed.
• Utilizing "Guides" as a word for "teacher." See above. Again- we use the term coach, but we do have Montessori locations within our affiliation. Montessori used that term long before Acton.
• Referring to a teacher as a "guide" or "Socratic guide." See above
• Referring to classrooms as "studios" Martial arts schools also stay studios. Again- not a primary focal point for us, and things like classrooms are also fine by us.
• Referring to "A badge system" to "track progress" and a promise of "no grades" See above response.
• Utilizing the term or phrase "Servant Leadership" as a term to describe learners in one studio serving another. See above response
• Utilizing an 11-month annual calendar with four to six week sessions ending in a public exhibition and a week break in between, highlighted by narrative based, hands on "quests" to develop real world skills (all Acton concepts and procedures). See above response
• Utilizing daily schedules appropriated directly from Acton, including 2 – 3 "Socratic launches" a day, D.E.A.R ("Drop Everything And Read Rime" and "Core Skills" in the morning and "Quests" in the afternoon. See above response
• Utilizing the term or phrase "We believe children are far more capable than you ever Imagined." Remnants from the old Acton site, and needs to be removed.
• Utilizing the term or phrase "Peace corner." Remnants from the old Acton site, and needs to be removed. No such thing as an Apogee Peace Corner
• Utilizing answers, terms or phrases in Apogee's FAQ that have previously been authored or credited by Acton. Remnants from the old Acton site, and needs to be removed.
• Utilizing language for Apogee job postings that have previously been authored or created by Acton in Acton's job postings. Remnants from the old Acton site, and needs to be removed.
• Utilizing the term or phrase "We believe that learning to do; learning to be and learning to learn are more important than memorization alone - learning to know." Remnants from the old Acton site, and needs to be removed.

• Utilizing the term or phrase "Children's Business Fair." Remnants from the old Acton site, and needs to be removed.

• Utilizing the term or phrase "Our mission is to inspire each person who enters our doors to find a calling and change the world" Remnants from the old Acton site, and needs to be removed.

**The below part was not sent to affiliates, but we want to respond.**

Requests to review:

1. Apogee mails and requests sent to prospective owners and prospective parents as part of the sales funnel process, including outreach emails, drip email campaigns and/or information requested;

Our "sales funnel" is primarily conversation and word of mouth. You are more than welcome to dive into the hours of podcasts and the hours of Instagram lives freely available on all platforms. Acton is rarely brought up (IG lives, if at all, by attendees), and our answer is and always has been in the same vein of support for Acton Academy and its success, but that we are not the same system in the least.

Affiliates apply through the link on the Apogee website, and go to a series of conversations around what we are building together. There are 5-6 hours worth of calls around how we will help provide them with a roadmap of steps to take, predominantly in the realm of business. They go through a 6 week training to understand how to navigate developing their own perspectives around state rules and regulations, marketing to the community via social media or in person meetups, finding a location with our commercial realtors, etc.

There is no created playbook at this time. We create a website and payment processing system for each campus, and we tie that to our 2 Foundations that exist for campus and student support, respectively. This system utilizes the Go High Level software, and Rapid Active CRM.

We record live QA training on the various "buckets" regarding our campuses/leadership facilities, and place those in our private platforms on META Workplace.

Verbal Communication Bucket: We generate Socratic conversation starters using AI technology. We use open sources to dive into logical fallacies, communicating orally, public speeches and presentations, etc. We have specific partners (ie The Tuttle Twins, Echelon Front, etc) in this that are not related to Acton in any way.

Written Communication Bucket: We assign/offer a list of classics and use AI to generate writing prompts, while using open source resources.

Academic Bucket: We utilize open source resources, Montessori resources, platforms such as Synthesis, and good old fashioned textbooks to give options for students to accomplish traditional academia. Coaches act as tutors, answering a myriad of questions. Parents are also welcome to volunteer as tutors during this time.

Physical Education Bucket: students have a mandatory calisthenics program, followed by utilization of resources supplied by our partner, Physiology First.

School Economy: We utilize a school economy designed by and employed at an independently owned school from Idaho.

Projects: All of our very own IP on projects were sent to you so that you can see it's not related to Acton in any way.

Mini Projects: These are created from the minds of our affiliates, and can be as simple as deep dives into the declaration of independence or embarking on a garage sale flip challenge for 30 days.
Apogee Man: This is a 12 month roadmap for male parents of our students, all created by Matt, Tim, and a host of guest mentors. This is an Apogee only curriculum, and Apogee only concept.
Apogee Woman: This is a 12 month roadmap for female parents of our students, all created by Matt, Tim, and a host of guest mentors. This is an Apogee only curriculum, and Apogee only concept.
Apogee Live Family Events: Full family events that incorporate our Apogee Code, fitness, and emotional challenges.
Apogee Coaches: our coaches are COACHED to deliver in person events, or to coach parents in the virtual 12 month programs.

As you can see- this is entirely our own. From the pedagogy down to the business practices, we are not the same, nor do we desire to be.
We do have former Acton Guides and owners who are affiliating with us that can also corroborate everything being shared here.
We want Acton to be successful, but in the same way that we want any alternative to be successful. We aren't watching anything that anyone else is doing, nor do we care to.

We wish everyone success on this parallel mission.

*Matt Beaudreau*
*President, Apogee Strong Programs*
*Founder, Apogee Strong Foundation*

On Thu, Jun 27, 2024 at 3:54 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

Apogee Cedar Park website has been updated to reflect our organization, and audits around the other sites up next.

Will still come back with a list of info and insight for you to understand our processes and systems without unreasonably handing over all of our IP that has taken a lot of time and money to create.

*Matt Beaudreau*
*President, Apogee Strong Programs*
*Founder, Apogee Strong Foundation*

On Wed, Jun 26, 2024 at 9:34 AM Brian Bishop <brian@bbishoplaw.com> wrote:

Thank you for your response and agreement to take remove all Acton content. Please confirm that you will also notify Apogee affiliate schools that Acton content must be removed from their websites and materials as well. We'd also like your agreement that Apogee and Apogee affiliate schools will include narrative in their websites that states that Apogee is not affiliated with Acton Academy and does not utilize Acton Academy curriculum, processes, material, or other content unique or proprietary to Acton Academy.

With respect to your agreement to *send you our proprietary projects that show we are intentionally different* and to *get all projects sent to this email address so that you can pass along to anyone at Acton. They will easily be able to verify that they are Apogee materials only* - here is what we would like to review:

1. Apogee mails and requests sent to prospective owners and prospective parents as part of the sales funnel process, including outreach emails, drip email campaigns and/or information requested;
2. The entire package of the learning design offered to owners:
    a. Yearly schedules
    b. Session schedules
    c. Daily schedules
    d. Any checklists or systems offered to build tribes or run the studios.
    e. Any handbooks offered to owners or guides.
    f. All launches that have been created.
    g. All learning challenges.
    h. Messages sent to parents.
    i. Any materials offered to owners during orientation.
    j. Materials used to equip guides or parents.

We look forward to your cooperation.

---

**From:** Matt Beaudreau <matt@apogeestrong.com>
**Sent:** Tuesday, June 25, 2024 4:00 PM
**To:** Brian Bishop <brian@bbishoplaw.com>
**Cc:** Carl Cringle <carl@sheepdogresponse.com>; Maike Kellner <maike@sheepdogresponse.com>; Tim Kennedy <tim@sheepdogresponse.com>
**Subject:** Re: Acton Academy: Proprietary and Protected Content

Hey Brian-

Site is being updated as we speak.

We are also holding an affiliate meeting this week to make sure any sites on their end are going to be compliant, and representative of what we are doing.

Internet has been down at the farm for two days straight, but once back up, I can more easily send over some summaries and responses that show how vastly different we are from anything Acton is doing.

Just wanted to keep you in the loop.

*Matt Beaudreau*

*President, Apogee Strong Programs*

*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 5:28 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

> Brian-
>
> Just keeping you updated as we go along. All of our campuses will be utilizing these seven projects over the course of the year.
>
> As you can see, they are not Acton materials.
>
> As we go through and update the Apogee Cedar Park website, we will do any audit of any campuses to make sure verbiage is reasonable and open source in nature.
>
> I will also send a more realistic view of our campuses than is depicted on the website, because it is markedly different in numerous ways. Definitely needs to be rectified on the site, itself. We are on it.
>
> Will continue to update you as we move swiftly through the updated so that all parties involved can continue the same mission of serving families, albeit it in a very different fashion.

*Matt Beaudreau*

*President, Apogee Strong Programs*

*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 4:40 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

Hi Brian-

Letters received.

My sense is that this is in reference to the Apogee Cedar Park website (former Acton campus). We definitely need to update that site to represent verbiage on our side which is intentionally different.

Everything for Apogee Centers has been created in house to the tune of well into six figures. Not only will we gladly update any sites with verbiage that reasonably suggests "Acton" verbiage, we will send you our proprietary projects that show we are intentionally different.

1- We will get all projects sent to this email address so that you can pass along to anyone at Acton. They will easily be able to verify that they are Apogee materials only.

2- We will get the Apogee Cedar Park website updated, asap. Assuming this may take a few days.

3- We will check for any verbiage that can reasonably be expected to change. Certain terms seem like they may not be proprietary to Acton Academy, but we will do our best to make sure it's obviously not related.

*Matt Beaudreau*

*President, Apogee Strong Programs*

*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 1:59 PM Brian Bishop <brian@bbishoplaw.com> wrote:

LAW OFFICE OF BRIAN W. BISHOP
900 WEST AVENUE
AUSTIN, TEXAS 78701
(512) 327-5121
brian@bbishoplaw.com
www.brianbishoplaw.com

**Brian Bishop**

**From:** Matt Beaudreau <matt@apogeestrong.com>
**Sent:** Thursday, June 27, 2024 2:55 PM
**To:** Brian Bishop
**Cc:** Carl Cringle; Maike Kellner; Tim Kennedy
**Subject:** Re: Acton Academy: Proprietary and Protected Content

Apogee Cedar Park website has been updated to reflect our organization, and audits around the other sites up next.

Will still come back with a list of info and insight for you to understand our processes and systems without unreasonably handing over all of our IP that has taken a lot of time and money to create.

*Matt Beaudreau*
*President, Apogee Strong Programs*
*Founder, Apogee Strong Foundation*

On Wed, Jun 26, 2024 at 9:34 AM Brian Bishop <brian@bbishoplaw.com> wrote:

Thank you for your response and agreement to take remove all Acton content. Please confirm that you will also notify Apogee affiliate schools that Acton content must be removed from their websites and materials as well. We'd also like your agreement that Apogee and Apogee affiliate schools will include narrative in their websites that states that Apogee is not affiliated with Acton Academy and does not utilize Acton Academy curriculum, processes, material, or other content unique or proprietary to Acton Academy.

With respect to your agreement to *send you our proprietary projects that show we are intentionally different* and to *get all projects sent to this email address so that you can pass along to anyone at Acton. They will easily be able to verify that they are Apogee materials only* - here is what we would like to review:

1. Apogee mails and requests sent to prospective owners and prospective parents as part of the sales funnel process, including outreach emails, drip email campaigns and/or information requested;
2. The entire package of the learning design offered to owners:
    a. Yearly schedules
    b. Session schedules
    c. Daily schedules
    d. Any checklists or systems offered to build tribes or run the studios.
    e. Any handbooks offered to owners or guides.
    f. All launches that have been created.
    g. All learning challenges.
    h. Messages sent to parents.
    i. Any materials offered to owners during orientation.
    j. Materials used to equip guides or parents.

We look forward to your cooperation.

---

**From:** Matt Beaudreau <matt@apogeestrong.com>
**Sent:** Tuesday, June 25, 2024 4:00 PM
**To:** Brian Bishop <brian@bbishoplaw.com>
**Cc:** Carl Cringle <carl@sheepdogresponse.com>; Maike Kellner <maike@sheepdogresponse.com>; Tim Kennedy <tim@sheepdogresponse.com>
**Subject:** Re: Acton Academy: Proprietary and Protected Content

Hey Brian-

Site is being updated as we speak.

We are also holding an affiliate meeting this week to make sure any sites on their end are going to be compliant, and representative of what we are doing.

Internet has been down at the farm for two days straight, but once back up, I can more easily send over some summaries and responses that show how vastly different we are from anything Acton is doing.

Just wanted to keep you in the loop.

*Matt Beaudreau*

*President, Apogee Strong Programs*

*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 5:28 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

Brian-

Just keeping you updated as we go along. All of our campuses will be utilizing these seven projects over the course of the year.

As you can see, they are not Acton materials.

As we go through and update the Apogee Cedar Park website, we will do any audit of any campuses to make sure verbiage is reasonable and open source in nature.

I will also send a more realistic view of our campuses than is depicted on the website, because it is markedly different in numerous ways. Definitely needs to be rectified on the site, itself. We are on it.

Will continue to update you as we move swiftly through the updated so that all parties involved can continue the same mission of serving families, albeit it in a very different fashion.

*Matt Beaudreau*

*President, Apogee Strong Programs*

*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 4:40 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

> Hi Brian-
>
> Letters received.

My sense is that this is in reference to the Apogee Cedar Park website (former Acton campus). We definitely need to update that site to represent verbiage on our side which is intentionally different.

Everything for Apogee Centers has been created in house to the tune of well into six figures. Not only will we gladly update any sites with verbiage that reasonably suggests "Acton" verbiage, we will send you our proprietary projects that show we are intentionally different.

1- We will get all projects sent to this email address so that you can pass along to anyone at Acton. They will easily be able to verify that they are Apogee materials only.

2- We will get the Apogee Cedar Park website updated, asap. Assuming this may take a few days.

3- We will check for any verbiage that can reasonably be expected to change. Certain terms seem like they may not be proprietary to Acton Academy, but we will do our best to make sure it's obviously not related.

*Matt Beaudreau*

*President, Apogee Strong Programs*

*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 1:59 PM Brian Bishop <brian@bbishoplaw.com> wrote:

LAW OFFICE OF BRIAN W. BISHOP
900 WEST AVENUE
AUSTIN, TEXAS 78701
(512) 327-5121
brian@bbishoplaw.com
www.brianbishoplaw.com

**Brian Bishop**

**From:** Matt Beaudreau <matt@apogeestrong.com>
**Sent:** Tuesday, June 25, 2024 4:00 PM
**To:** Brian Bishop
**Cc:** Carl Cringle; Maike Kellner; Tim Kennedy
**Subject:** Re: Acton Academy: Proprietary and Protected Content

Hey Brian-

Site is being updated as we speak.

We are also holding an affiliate meeting this week to make sure any sites on their end are going to be compliant, and representative of what we are doing.

Internet has been down at the farm for two days straight, but once back up, I can more easily send over some summaries and responses that show how vastly different we are from anything Acton is doing.

Just wanted to keep you in the loop.

*Matt Beaudreau*
*President, Apogee Strong Programs*
*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 5:28 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

Brian-

Just keeping you updated as we go along. All of our campuses will be utilizing these seven projects over the course of the year.

As you can see, they are not Acton materials.

As we go through and update the Apogee Cedar Park website, we will do any audit of any campuses to make sure verbiage is reasonable and open source in nature.

I will also send a more realistic view of our campuses than is depicted on the website, because it is markedly different in numerous ways. Definitely needs to be rectified on the site, itself. We are on it.

Will continue to update you as we move swiftly through the updated so that all parties involved can continue the same mission of serving families, albeit it in a very different fashion.

*Matt Beaudreau*
*President, Apogee Strong Programs*

*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 4:40 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

Hi Brian-

Letters received.

My sense is that this is in reference to the Apogee Cedar Park website (former Acton campus). We definitely need to update that site to represent verbiage on our side which is intentionally different.

Everything for Apogee Centers has been created in house to the tune of well into six figures. Not only will we gladly update any sites with verbiage that reasonably suggests "Acton" verbiage, we will send you our proprietary projects that show we are intentionally different.

1- We will get all projects sent to this email address so that you can pass along to anyone at Acton. They will easily be able to verify that they are Apogee materials only.

2- We will get the Apogee Cedar Park website updated, asap. Assuming this may take a few days.

3- We will check for any verbiage that can reasonably be expected to change. Certain terms seem like they may not be proprietary to Acton Academy, but we will do our best to make sure it's obviously not related.

*Matt Beaudreau*
*President, Apogee Strong Programs*
*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 1:59 PM Brian Bishop <brian@bbishoplaw.com> wrote:

LAW OFFICE OF BRIAN W. BISHOP
900 WEST AVENUE
AUSTIN, TEXAS 78701
(512) 327-5121
brian@bbishoplaw.com
www.brianbishoplaw.com

**Brian Bishop**

| | |
|---|---|
| **From:** | Matt Beaudreau <matt@apogeestrong.com> |
| **Sent:** | Monday, June 24, 2024 4:29 PM |
| **To:** | Brian Bishop |
| **Cc:** | Carl Cringle; Maike Kellner; Tim Kennedy |
| **Subject:** | Re: Acton Academy: Proprietary and Protected Content |
| **Attachments:** | Apogee Session Seven Overview, Building Your Brand_Business.pdf; Apogee Session Six Overview, Shark Tank 2.pdf; Apogee Session Five Overview, Seeking Sovereignty .pdf; Apogee Session Four Overview, Speech & Debate.pdf; Apogee Session Three Overview, Health Equals Wealth.pdf; Apogee Session Two Overview, Be the CEO of Your Own Life.pdf; Apogee Session One Overview, What's Your Code_.pdf |

Brian-

Just keeping you updated as we go along. All of our campuses will be utilizing these seven projects over the course of the year.

As you can see, they are not Acton materials.

As we go through and update the Apogee Cedar Park website, we will do any audit of any campuses to make sure verbiage is reasonable and open source in nature.

I will also send a more realistic view of our campuses than is depicted on the website, because it is markedly different in numerous ways. Definitely needs to be rectified on the site, itself. We are on it.

Will continue to update you as we move swiftly through the updated so that all parties involved can continue the same mission of serving families, albeit it in a very different fashion.

*Matt Beaudreau*
*President, Apogee Strong Programs*
*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 4:40 PM Matt Beaudreau <matt@apogeestrong.com> wrote:

Hi Brian-

Letters received.

My sense is that this is in reference to the Apogee Cedar Park website (former Acton campus). We definitely need to update that site to represent verbiage on our side which is intentionally different.

Everything for Apogee Centers has been created in house to the tune of well into six figures. Not only will we gladly update any sites with verbiage that reasonably suggests "Acton" verbiage, we will send you our proprietary projects that show we are intentionally different.

1- We will get all projects sent to this email address so that you can pass along to anyone at Acton. They will easily be able to verify that they are Apogee materials only.

2- We will get the Apogee Cedar Park website updated, asap. Assuming this may take a few days.

3- We will check for any verbiage that can reasonably be expected to change. Certain terms seem like they may not be proprietary to Acton Academy, but we will do our best to make sure it's obviously not related.

*Matt Beaudreau*
*President, Apogee Strong Programs*
*Founder, Apogee Strong Foundation*

On Mon, Jun 24, 2024 at 1:59 PM Brian Bishop <brian@bbishoplaw.com> wrote:

LAW OFFICE OF BRIAN W. BISHOP
900 WEST AVENUE
AUSTIN, TEXAS 78701
(512) 327-5121
brian@bbishoplaw.com
www.brianbishoplaw.com

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Acton Academy

**DEFENDANTS**

Tim Kennedy, Apogee TX High Plains, LLC, Apogee Denton, LLC, Cameron Penn and Lauren Penn d/b/a

**(b)** County of Residence of First Listed Plaintiff Travis
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jason W. Snell
Snell Law

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☒ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
Violation of The Defend Trade Secrets Act, 18 U.S.C. §§ 1836, 1839

Brief description of cause:
trademark infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE
November 22, 2024

SIGNATURE OF ATTORNEY OF RECORD
Jason W. Snell

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.